1

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      WEST PALM BEACH DIVISION


 3
     IN RE:
 4
     ERNEST W. WILLIS,         CASE NO. 07-11010-BKC-PGH
 5
                     Debtor.
 6   _____/

 7   DEBORAH MENOTTE,
                 Plaintiff,
 8       v.                   ADV. NO. 08-01383-BKC-PGH-A

 9   ERNEST W. WILLIS,
                 Defendant.
10   _____/

11
                    EXCERPT FROM PROCEEDINGS
12        TESTIMONY OF HARRY ROSS AND ERNEST WILLIS
       OBJECTION TO DEBTOR'S AMENDED EXEMPTIONS FILED BY
13       TRUSTEE, DEBORAH MENOTTE (379) and OBJECTION TO
     DEBTOR'S CLAIM OF EXEMPTIONS TO AMENDED SCHEDULE C
14        FILED BY CREDITOR RED REEF, INC. (378)

15                  TRIAL - ADV. 08-01383 (1)
                       December 3, 2008
16                      A.M. SESSION


17     The above-styled cause came on for hearing before

18   the HONORABLE PAUL G. HYMAN, JR., Chief Judge of the

19   United States Bankruptcy Court, in and for the

20   Southern District of Florida, at 1515 North Flagler

21   Drive, West Palm Beach, Palm Beach County, Florida on

22   Wednesday, December 3, 2008, commencing at or about

23   9:30 a.m., and the following proceedings were had:

24
                     Reported by:  Anna M. Meagher
25
```

2

```
1                    APPEARANCES:

2               KEVIN C. GLEASON, P.A., by
                KEVIN C. GLEASON, ESQUIRE,
3                on behalf of the Debtor.

4
             THE RAKUSIN LAW FIRM, P.A., by
5               STEPHEN RAKUSIN, ESQUIRE
                on behalf of Red Reef, Inc.
6

7          EHRENSTEIN CHARBONNEAU CALDERIN, by
              ROBERT P. CHARBONNEAU, ESQUIRE,
8          Co-counsel on behalf of Red Reef, Inc.

9
                RUDEN McCLOSKY, P.A., by
10              HEATHER L. RIES, ESQUIRE
               on behalf of Deborah Menotte,
11                Chapter 7 Trustee.

12
                    -  -   -   -   -   -

13

14                    I N D E X

15  THE WITNESS              DIRECT CROSS REDIRECT RECROSS

16  HARRY ROSS, ESQUIRE
       By Mr. Gleason              7          --
17     By Mr. Rakusin                  9
    ERNEST W. WILLIS
18     By Mr. Gleason          17
       By MR. Rakusin

19

20
              EXHIBITS RECEIVED INTO EVIDENCE
21
      Number                               Page
22
      1 thru 35                               7
23       38                                  44
         37                                  44
24

25
```

OUELLETTE & MAULDIN COURT REPORTERS
(305)358-8875

1          THE COURT:  Willis.

2          MR. GLEASON:  Good morning, your Honor.  May

3  it please the Court, Kevin Gleason for Mr. Willis.

4          MR. RAKUSIN:  Good morning, your Honor.

5  Steven Rakusin on behalf of the trustee and creditor

6  Red Reef, Inc., and with us today from Red Reef, Inc.

7  are Jane Backster and Ted Backster.

8          MR. CHARBONNEAU:  Judge, I'm Bob Charbonneau,

9  Ehrenstein Charbonneau Calderin.  We're co-counsel to

10 Red Reef in this matter.

11         THE COURT:  Okay.  Good.

12         MS. RIES:  Heather Ries on behalf of the

13 Chapter 7 trustee, Deborah Menotte.

14         THE COURT:  Good.

15         A couple -- I just want to make sure about

16 scheduling issues.  First, Mr. Gleason, as I

17 understand it, has an 11:45 hearing in front of Judge

18 Kimball.  We're going to stop for lunch at 11:45.

19 We'll reconvene at one o'clock.

20         If we don't get done today, and I'm hopeful

21 we will get done today, we will reconvene at 9:30 to

22 finish up.  I expect the parties to understand my

23 rules concerning objections, that is there are no

24 speaking objections tolerated in this court.

25 Objections should be two or three words, objection,

1  and what the evidentiary basis is.

2      Finally, there was something I should have

3  followed up on yesterday.  There was a statement by

4  Mr. Gleason that the earlier deposition that you

5  asserted was a 2004 was a deposition and had no

6  mention of 2004.  I want to see that deposition, see

7  where it indicates that.

8      MR. CHARBONNEAU:  Judge, two -- excuse me.

9  The notice that was filed is a state court style, but

10  very clearly on the title it says, "Notice of Taking

11  2004" --

12      THE COURT:  I just asked to see it.

13      Mr. Gleason said it doesn't.

14      MR. CHARBONNEAU:  It's filed, Judge.

15      THE COURT:  It's filed with the court?  Okay.

16      MR. GLEASON:  DE 514, it was filed yesterday.

17      THE COURT:  514?

18      MR. GLEASON:  Right.

19      THE COURT:  Thank you.

20      Okay.  Go ahead.  First witness.

21      MR. RAKUSIN:  Your Honor, is the Court going

22  to waive opening statements?

23      THE COURT:  Believe me, I'm familiar enough

24  with this case and the issues raised and with the

25  pleadings to let you start on the evidence.  Let's get

 1  going on the evidence.

 2          MR. GLEASON:  Judge, counsel has been kind

 3  enough to permit me, with your Honor's approval, to

 4  put Harry Ross on, out of turn, since he's here,

 5  rather than make him come back.  He's a very short

 6  witness.

 7          THE COURT:  That's fine with me.

 8          MR. GLEASON:  Tall man, but short witness.

 9          MR. RAKUSIN:  That's correct, your Honor.

10          THE COURT:  That's fine with me.

11          MR. GLEASON:  May I just get him?

12          THE COURT:  Yes, sir.

13          MR. CHARBONNEAU:  Your Honor, while

14  Mr. Gleason is doing that, what was the docket entry?

15          THE COURT:  514 is what he said.  I'm looking

16  at it right now.

17          MR. CHARBONNEAU:  Uh-oh.

18          THE COURT:  Okay.  It says it.

19          MR. CHARBONNEAU:  Was I correct?

20          THE COURT:  Yes, sir, Which means you're not

21  the one that's going to get yakked at.  Mr. Gleason

22  is.

23          MR. CHARBONNEAU:  Always a good position to

24  be in, Judge.

25          THE COURT:  One or the other of you were

1  going to get yakked at.

2        MR. ROSS:  I'm sorry, Judge.

3        THE COURT:  It's okay.

4        MR. RAKUSIN:  Your Honor, before Mr. Ross

5  testifies, Mr. Gleason and I have agreed that we can

6  put in the exhibits, various exhibits, in this case,

7  which will probably make it simpler to go ahead.

8        THE COURT:  That's fine.

9        MR. RAKUSIN:  We provided the Court with

10  various boxes of exhibits, and I believe that we have

11  20 -- we have 35 --

12        THE COURT:  When you say you "provided them

13  to the court" --

14        MR. RAKUSIN:  -- exhibits.

15        THE COURT:  Now, when you say "provided to

16  the court," you haven't given me anything.  There may

17  be something sitting over in the corner of the court,

18  but I don't have anything, just so you're --

19        MR. RAKUSIN:  That's correct.

20  Mr. Charbonneau is going to bring those over as

21  Mr. Gleason and I go through the exhibits and --

22        THE COURT:  Well, I need an exhibit register

23  in order to indicate which -- unless all of them are

24  admitted into evidence.

25        MR. RAKUSIN:  Correct, your Honor.  I believe

1   there's no objection as to 1 through 35, and there's

2   an exhibit register in the front of each volume of the

3   notebooks.

4           THE COURT:  Let me have them.

5           MR. CHARBONNEAU:  I've become useful in this

6   case, your Honor.

7           THE COURT:  I see the hierarchy, right?

8           MR. GLEASON:  Judge, I would just confirm as

9   to Exhibits 1 through 35, there's no objection and

10  they all come in.

11          THE COURT:  Fine, 1 through 35 will be deemed

12  admitted into evidence.

13          (Thereupon, the Court received Exhibits No. 1

14  through 35 into evidence.)

15  Thereupon,

16                  HARRY ROSS, ESQUIRE

17  was called as a witness, and after first being duly

18  sworn, was examined and testified under oath as

19  follows:

20          THE COURT:  Just set them there.  That will

21  be fine.  Thank you.

22                  DIRECT EXAMINATION

23    BY MR. GLEASON:

24      Q   Please state your name.

25      A   Harry Ross.

1    Q    And are you a member of the Florida Bar?

2    A    I am.

3    Q    How long have you been a member of the

4 Florida Bar?

5    A    I've been a member of the Florida Bar since

6 1990.

7    Q    How long have you known Mr. Wills?

8    A    I would say our relationship started about

9 1992, perhaps.

10    Q    Have you represented him in various

11 transactions and matters through the years?

12    A    That is correct.

13    Q    Did there come a time when Mr. Wills asked

14 you to render an opinion as to whether or not -- I

15 should say -- excuse me.

16        Did there come a time when Mr. Wills asked

17 you to render an opinion that a mortgage, which we've

18 come to know as the People's mortgage, could be put

19 into his Merrill Lynch IRA?

20    A    I was requested to do so.

21    Q    Did you do so?

22    A    I did not.

23    Q    Why is that?

24    A    Number one, I was not qualified as a tax

25 expert at that point time, and I'm still not, and

1    second of all, I didn't think that that was a

2    transaction that would be correct.

3        Q    So did you communicate that to Mr. Wills,

4    that he could not do that transaction?

5        A    Absolutely.

6        Q    Were you also involved in the transaction

7    pursuant to which Mr. Wills acquired the People's

8    mortgage?

9        A    Yes, I represented him.

10        Q    And would you classify that as a dry closing?

11        A    Correct.

12        Q    Could you explain what a dry closing means?

13        A    Papers were executed by the parties before

14    there was an actual funding of that particular loan

15    closing.

16            MR. GLEASON:  Thank you.  I have nothing

17    further.

18            THE COURT:  Cross?

19            MR. RAKUSIN:  Yes, your Honor.

20            Your Honor, if I may approach the witness

21    with some of the exhibits?

22            THE COURT:  Yes, sir.

23                        CROSS-EXAMINATION

24    BY MR. RAKUSIN:

25        Q    In regard to the People's mortgage,

1  originally that was supposed to be -- the cost of that

2  mortgage, the buyout of it, was supposed to be shared

3  by Mr. Jack Amino (phonetic) and Mr. Willis, correct?

4      A   Correct.

5          MR. GLEASON:  It's beyond the scope, Judge.

6  Unless he's going to call him in his direct.

7          THE COURT:  I will overrule that.

8  BY MR. RAKUSIN:

9      Q   Ultimately there came a time where you became

10 aware that Mr. Willis was going to come up with the

11 money himself for the mortgage, correct?

12     A   Mr. Willis took care of funding the mortgage.

13     Q   Correct.

14         And how Mr. Willis did that is he -- are you

15 aware that Mr. Willis told you he rolled various IRAs

16 into an IRA at Merrill Lynch, correct?

17         MR. GLEASON:  Objection, attorney/client

18 privilege.

19         THE COURT:  Response?

20         MR. RAKUSIN:  Judge, I believe he waived it.

21 He asked him several questions on direct about what

22 Mr. Willis told him about the transaction.

23         MR. GLEASON:  That's not what I asked, Judge.

24 I asked Mr. Ross very carefully whether he was

25 requested to issue an opinion and whether he issued

1  that opinion, and he said no, and I asked him why, and

2  he gave the reasons.  I didn't ask him to breach any

3  communications between himself and his client.

4          THE COURT:  My notes indicate that the

5  testimony was that he told Mr. Willis he could not put

6  the mortgage into the IRA, so tell me why that is not

7  a waiver of the attorney/client privilege in that

8  area.

9          MR. GLEASON:  If we are going by area, what

10  Mr. Rakusin has switched to is funding and

11  conversations about funding, and that has nothing to

12  do with an opinion of counsel as to whether or not a

13  transaction could be consummated between the Merrill

14  Lynch IRA and a mortgage.  It was a very specific,

15  very narrow question.

16          THE COURT:  What's your question, again?

17          Ask it again.

18          MR. RAKUSIN:  Judge, I asked him if

19  Mr. Willis had advised him that he was putting money

20  together in the Merrill Lynch IRA from other IRAs to

21  fund the mortgage?

22          THE COURT:  I'm going to overrule the

23  objection.  I believe it's within the same subject

24  matter and area that the witness has already testified

25  to, and thus the privilege was waived.

1          THE WITNESS:  Would you repeat your question

2    one more time?

3    BY MR. RAKUSIN:

4      Q    Did Mr. Willis advise you that he was putting

5    money together from various IRAs into a Merrill Lynch

6    IRA to fund the acquisition of the mortgage?

7      A    I don't recall that.

8      Q    You knew ultimately that the money that came

9    from the -- the actual funding for the acquisition of

10   the mortgage came from the Merrill Lynch IRA; isn't

11   that true?

12     A    We're going 14 years ago, and if you're going

13   to test my memory as to what the exact conversation

14   may have been with Mr. Willis at that point in time,

15   I'm going to tell you right now, I do not have 100

16   percent recall of every single event or conversation

17   that took place 14 years ago.

18     Q    Okay.  I understand that.

19          Sir, is it true that in regard to Merrill

20   Lynch, you received a memo directly from Merrill Lynch

21   requesting that you give them an opinion as to whether

22   the mortgage was a suitable investment in Mr. Willis'

23   IRA?

24     A    Do you have a copy of that memo?

25     Q    Take a look at composite Exhibit 9, if that

1   would refresh your memory, and I will direct you to --

2   if you go to the very -- the third page from the back

3   of Exhibit 9, the page that's Bate stamped

4   IS7230700077, it's a 12/14/93 fax sheet to Harry Ross.

5       A    Yeah, I see that Bate stamp, 77.

6       Q    And you received this letter after the time

7   of the closing, the dry closing, which you testified,

8   correct?

9       A    It's dated 12/14/1993, but I do not see a fax

10  stamp on it as to when it may have been sent to my

11  office, so I can't answer with 100 percent certainty.

12      Q    The dry closing in which you referred to,

13  that was the closing statement that is in Exhibit 7,

14  with the Bate No. EW 00074?

15      A    That appears to be a closing statement that

16  was on or about December 12, 1993.

17      Q    And so the closing statement -- did you

18  attend that closing?

19      A    Once again, I do not have 100 percent recall

20  if this was done through the mail or whether I

21  actually sat down with Mr. Willis at my office or his

22  office.

23      Q    And going to Exhibit 8, that's the assignment

24  of the mortgage, correct?

25      A    This is a copy of an assignment of mortgage.

1    Q    And you understood that the mortgage that was

2  being assigned was a mortgage that dealt with a loan

3  and mortgage on Ocean One North's property, correct?

4    A    That is correct.

5    Q    And that was a corporation in which

6  Mr. Willis was a 50 percent stockholder, along with

7  his wife, Sunday Willis, correct?

8    A    Would you repeat that question again?

9    Q    Yeah.

10        Are you familiar with the fact that Ocean One

11  North, Inc., Mr. Willis, along with his wife Sunday

12  Willis, was a 50 percent shareholder?

13    A    I'm a little confused.

14        Are you saying that both Mr. and Mrs. Willis

15  were each 50 percent shareholder or they were a 50

16  percent shareholder combined?

17    Q    Combined.

18    A    I believe that's correct.

19    Q    And then after the dry closing is when you

20  received the request from Irving Silver to render an

21  opinion regarding the suitability of the mortgage as

22  an investment for the Merrill Lynch IRA maintained by

23  Mr. Willis; isn't that true?

24    A    That is correct.

25    Q    And you didn't render an opinion in that

1  regard at all, did you?

2      A    I did not.

3      Q    And do you know of any other attorney -- did

4  you refer Mr. Willis to any other attorney to obtain

5  an opinion as to whether it would be a suitable

6  investment for an IRA?

7      A    I cannot recall.

8          MR. RAKUSIN:  No further questions, your

9  Honor.

10         THE COURT:  Redirect?

11         MR. GLEASON:  None, thank you, Judge.

12         THE COURT:  You can step down, sir.

13         THE WITNESS:  Thank you.

14         THE COURT:  May this witness be excused?

15         MR. RAKUSIN:  Yes, your Honor.

16  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

17         THE COURT:  Next witness.

18         MR. RAKUSIN:  At this point in time, your

19  Honor, we will call Ernest Willis.

20         THE COURT:  Okay.  Thank you.

21         MR. RAKUSIN:  Your Honor, with permission of

22  the Court, may Ms. Dixon remain in the courtroom?

23         THE COURT:  Sure.

24  Thereupon,

25                    ERNEST W. WILLIS

1    was called as a witness, and after first being duly

2    sworn, was examined and testified under oath as

3    follows:

4         THE COURT:  Mr. Gleason, I should have shown

5    you the courtesy, do you have any objection to

6    Ms. Dixon remaining in the courtroom?

7         MR. GLEASON:  No, Judge, I don't think an

8    expert can be excluded, but I've lost that issue once.

9         THE COURT:  That's the reason I said yes, but

10   I wanted to make sure you had no objection.

11        MR. CHARBONNEAU:  I would agree with

12   Mr. Gleason.

13        MR. RAKUSIN:  As a housekeeping matter, I

14   noticed some papers up there that didn't really have

15   anything to do with our case.

16        THE COURT:  Probably yesterday's case.

17        Thank you.

18        MR. CHARBONNEAU:  Your Honor, may I assist

19   Mr. Willis in retrieving the books that Mr. Rakusin is

20   going to make reference to?

21        THE COURT:  I don't understand what you mean.

22        MR. CHARBONNEAU:  They are all stacked by the

23   witness box.

24        MR. GLEASON:  And, Judge, we would appreciate

25   it.  Mr. Willis had a car accident, and he can't lift

1  his right arm.

2          THE COURT:  That's okay, that's fine.  I

3  didn't quite understand what you meant by assisting

4  Mr. Willis with retrieval.

5          MR. CHARBONNEAU:  They are all there and they

6  are heavy.

7          THE COURT:  Sure.  You can point them out to

8  him.

9          MR. RAKUSIN:  Just give him -- let's go to

10 volume -- let's go to Volume I.  We will go over some

11 of these transactions.

12                  DIRECT EXAMINATION

13  BY MR. RAKUSIN:

14      Q   Good morning, Mr. Willis.

15      A   Good morning.

16      Q   You were a former bank CEO, correct?

17      A   Yes.

18      Q   And by 1993 you had at least ten different

19  IRAs at ten different banks, correct?

20      A   Could be.  I don't know the number.  Yes.

21      Q   And by 1996 your main IRA was in IRA at

22  Merrill Lynch, correct?

23      A   Yes.

24      Q   And you also had what was called the CMA

25  account at Merrill Lynch, correct?

1         MR. CHARBONNEAU:  Your Honor, if I may just

2   sort of get Mr. Willis a little more comfortable over

3   here.

4         Does this work for you over here like that?

5   Okay.

6         THE WITNESS:  Yes, sir.

7   BY MR. RAKUSIN:

8     Q   And in regard to the CMA account, that was a

9   combination cash management and brokerage account at

10  Merrill Lynch, correct?

11    A   I don't know what you mean by that.

12    Q   Well, in other words, you were able to write

13  checks on that account, correct?

14    A   Correct.

15    Q   So you had the ability, to the extent that

16  there was a section of your statement that showed you

17  how much cash you had available, to write checks,

18  correct?

19    A   Yes.

20    Q   And in 1996 you had invested in your CMA, the

21  non-IRA portion of the account which you held with

22  your wife, you were heavily invested in Mercury

23  Finance Company and BankOne Corp. in Ohio; isn't that

24  true?

25    A   Yes.

1    Q   And basically you had approximately -- by the

2   end of December approximately $386,000 in shares of

3   stock at the end of December 1996 in the value as it

4   related to Mercury Finance Company, correct?

5    A   I don't know.  I would have to see a

6   statement.

7           MR. RAKUSIN:  Okay.

8           (Inaudible discussion off the record between

9   Mr. Rakusin and Mr. Charbonneau.)

10          MR. CHARBONNEAU:  Your Honor, may I approach?

11          THE COURT:  Yes, sir.

12          MR. CHARBONNEAU:  Mr. Rakusin, do you want

13   both volumes?

14          MR. RAKUSIN:  Just Volume I, I believe,

15   Exhibit 24.

16   BY MR. RAKUSIN:

17    Q   Sir, if you take a look in the first -- under

18   Tab 1 of Volume -- Composite Exhibit 24, it's volume

19   Roman numeral one, and then go to Tab 1.

20          Do you see that, sir?

21    A   I'm in Tab 1, yes.

22    Q   Okay.  If you'll go to page -- the one that

23   ends in 640, the Bate stamp number?

24    A   Yes, sir.

25    Q   You had in -- that reflects that you had in

1   your cash management account, the non-IRA account, at

2   Merrill Lynch approximately $386,499 of stocks in

3   Mercury Finance Company, correct?

4       A   Yes.

5       Q   And then, of course, you had 130,290 in

6   BankOne Ohio, correct?

7       A   Correct.

8       Q   And at the time that was -- the value of the

9   Mercury Finance stock was based on an estimated market

10  price of $12.25 a share, correct?

11      A   Yes.

12      Q   Now, you were familiar with -- by the way,

13  did you trade your own stocks in 1996?

14      A   No.

15      Q   Who did that for you?

16      A   Nobody.  I didn't trade any stock.

17      Q   If you'll go to the very last item in the

18  notebook starting on Page 000624 of Volume I.

19          MR. RAKUSIN:  Your Honor, if we may have

20  Mr. Charbonneau approach?

21          THE COURT:  Yes.  You said the very last page

22  of --

23          MR. RAKUSIN:  The very last item, your Honor,

24  starting on page -- it would be the account statement

25  dated 1/1/97 to 1/31/97.

1          THE COURT:  I have it.

2          MR. RAKUSIN:  Consisting of 13 pages.

3          MR. CHARBONNEAU:  He's there, your Honor.

4  BY MR. RAKUSIN:

5      Q   Now, sir, at that point in time you had a

6  negative balance in your cash management account, the

7  non-IRA account, correct, as of January 31, 1997?

8      A   I don't see that, sir.

9          MR. RAKUSIN:  Your Honor, if I may approach?

10         THE COURT:  Yes, sir.

11  BY MR. RAKUSIN:

12     Q   Do you see where your cash management account

13  was negative $112,395, sir?

14     A   Yes.

15     Q   And, sir, isn't it true that was a result of

16  the price of Mercury Finance falling from $12.25 per

17  share to approximately $2.12 a share; isn't that true?

18     A   Yes.

19     Q   And, in fact, you lost approximately $320,000

20  in value in that 30-day period from the end of

21  December of 1996 to the end of January of 1997,

22  correct?

23     A   How much, sir?

24     Q   Approximately 320,000?

25     A   I would have to look -- what was the December

1  figure?  I don't remember.

2      Q    The December figure was 380,000 -- let me

3  give you that number, $386,499.75.

4      A    And that was -- now, it's two-oh-four, that's

5  182,000.

6      Q    And then as a result your account -- by the

7  way, you traded on margin in that account, didn't you?

8      A    No.

9      Q    Did you ever margin your account for Merrill

10 Lynch?

11     A    No, sir.

12     Q    Are you familiar with reading the Merrill

13 Lynch statements, sir?

14     A    Yes.

15     Q    Well, can you tell how it is that if you

16 still had 204,529 in stock in Mercury Finance -- oh,

17 I'm sorry, I misspoke.  You actually had, by the end

18 of January, only 67,644 in stock in Mercury Finance,

19 correct?

20     A    Yes.

21     Q    The two-oh-four is a combination of Bank Ohio

22 and Mercury Finance?

23     A    Correct.

24     Q    So when we were talking before about how you

25 had $386,000 in Mercury Finance stock, at the end of

1  the year in 1996, and you only had 67,644 at the end

2  of January, in fact, the value of your holding dropped

3  approximately $320,000, correct?

4      A   Okay.  Yes.

5      Q   Now, that caused a shortfall, didn't it, in

6  your CMA account, correct?

7      A   It looks like it, yes.

8      Q   And how you covered that is you then borrowed

9  from your IRA and took some money out of your IRA and

10 put it into your CMA account; isn't that true?

11     A   I don't know, sir.

12         MR. RAKUSIN:  Your Honor, if I may approach

13 the witness?

14         THE COURT:  Yes.

15         Where are you going?

16         MR. RAKUSIN:  I'm going, your Honor, to the

17 account statement that's February 1 to February 28,

18 1997, which is the next statement --

19         THE COURT:  Okay.  I've got it.

20         MR. RAKUSIN:  -- to the left, and it starts

21 with the 00610 number.

22         THE COURT:  I've got it.  Thank you.

23         Do you have it, Mr. Willis?

24         THE WITNESS:  Yes, I do now.

25 BY MR. RAKUSIN:

```
 1    Q   Okay.  Sir, if you go to Page 4 of 12 --

 2    A   Yes, sir.

 3    Q   -- that shows a journal entry of a deposit

 4  from Account No. 75174781 of $230,000, correct?

 5    A   Yes.

 6    Q   And that was posted on February 7, 2007,

 7  correct?

 8    A   Yes.

 9    Q   And you're familiar with fact that 75174781

10  is the IRA account, correct?

11    A   Yes.

12    Q   So that transaction was a withdrawal from the

13  Merrill Lynch IRA on February 7th of $230,000,

14  correct?

15    A   Yes.

16    Q   And the purpose of it was to cover the

17  shortfall in the cash management account that you

18  borrowed from your IRA and put it over into your

19  personal account, correct?

20    A   Yes.

21    Q   And you had total unfettered control of the

22  monies once it came to your individual account,

23  correct?

24    A   Yes.

25    Q   Now, what happened is, then, you wanted to
```

1  try and replace it within 60 days to avoid the tax

2  consequence; isn't that true?

3      A   Yes.

4      Q   But you had trouble because you didn't have

5  any place to get the money from other than your IRA

6  account at Merrill Lynch; isn't that true?

7      A   I believe so.

8      Q   So what you did is in April of 1997, you

9  withdrew an additional $240,000 from your IRA, put it

10 into your personal account with your wife, and then

11 wrote a check back for the two-thirty to go back into

12 your IRA; isn't that true?

13     A   I believe so.

14     Q   And then you still had outstanding, the

15 $240,000 item that you wanted to return to your IRA

16 somewhere in June, correct?

17     A   Yes.

18     Q   And you still had the same problem, you

19 didn't have funds to cover it, so what you did is in

20 June you wrote a check under -- you withdrew another

21 $180,000 and from your IRA and put into your CMA

22 account, so you could, then, write a $240,000 check

23 back to it, so you could try and roll it back,

24 correct?

25     A   Yes.

```
 1    Q   Then in August you had the same problem, you
 2  didn't have funds, so you had to make another
 3  withdrawal on August 8, 1997 from your IRA, put it
 4  into your CMA account, so you could write back a check
 5  out of your CMA account to your IRA; isn't that true?
 6    A   Yes.
 7    Q   Then --
 8        THE COURT:  Whoever did your chart has the
 9  180,000 -- they aren't lined up.
10        MR. RAKUSIN:  Judge, they are not supposed to
11  be.
12        THE COURT:  No, no, no, I'm saying the some
13  height.
14        MR. RAKUSIN:  That's true, Judge.  I
15  understand what you are saying now.  I spoke too soon.
16        (Laughter.)
17        MR. RAKUSIN:  Judge, I will agree with you,
18  my chart is defective in that regard.
19  BY MR. RAKUSIN:
20    Q   Going back in August, you knew you had to
21  return $180,000 to the IRA, but you still didn't have
22  the funds to do it, so you took another withdrawal
23  from your Merrill Lynch IRA, transferred it to your
24  CMA account, so you could then write a check for
25  180,000 back to your IRA, correct?
```

1    A   Yes.

2    Q   And then in October you were in the same

3  situation.  You didn't have enough funds in the

4  account to cover the $252,000 return, so what you did

5  is on October 8, 1997, you withdrew another $270,000

6  from your IRA, and then put it back -- then wrote a

7  check out of your cash management account to the IRA

8  for $252,000, correct?

9    A   Yes.

10    Q   And that was your attempt to roll back to the

11  withdrawal that you made in the prior August, correct?

12    A   Yes.

13    Q   Then in December you knew you were trying to

14  roll back to the $252,000 -- excuse me, the $270,000

15  that you had taken out of your IRA in October, and so

16  you had to do the same thing.  You wrote a check for

17  two-seventy, but it didn't clear until you put in a

18  withdrawal from your IRA to your cash management

19  account of $282,000; isn't that true?

20    A   Yes.

21    Q   Then you were able to clear the check.  Then

22  in February, approximately a couple months later, you

23  had to do the same thing.  You had to make another

24  withdrawal from your IRA of 285,000, put it in your

25  cash management, so your cash management on the same

1    day could write a check back to your IRA in regard to

2    the prior withdrawal, correct?

3        A    Yes.

4        Q    Then on April 8th you had same thing, two

5    months later.  You had to, then, take a check and try

6    to deposit it in order to cover the withdrawal that

7    you had taken two months earlier, roll it back, and

8    then what you had done is you had to make another

9    withdrawal $283,000 on April 8th, so that you could

10   clear the check for 285 that you were writing back to

11   the IRA, correct?

12       A    Yes.

13       Q    So you were swapping checks between the IRA

14   account and non-IRA account in order to try and comply

15   with the 60-day rollover rule, correct?

16       A    Yes.

17       Q    But you were aware at the same time you

18   weren't allowed to make multiple rollovers in a given

19   year out of the same account; isn't that true?

20       A    No.

21           MR. RAKUSIN:  Your Honor, if you'll just give

22   me a moment?

23           THE COURT:  By the way, is this chart one of

24   the exhibits?  If not, you need to make it part of the

25   record, since you --

1        MR. RAKUSIN:  I can do that, your Honor.

2    It's not part of the record, but I do have a small

3    chart that I can put in as part of the record, if the

4    Court will give me just a moment.

5        THE COURT:  Yes, sir.

6        Mr. Charbonneau can find it, and you can

7    continue with your questioning if you would like.

8        MR. RAKUSIN:  Thank you, your Honor.

9    BY MR. RAKUSIN:

10    Q   Well, you knew that you couldn't do

11   multiple -- you did have an understanding that you

12   couldn't do multiple rollovers in one year; isn't that

13   true?

14    A   No.

15    Q   What was your understanding about multiple

16   rollovers?

17    A   I didn't have any understanding.

18    Q   Now, sir, isn't it true that effectively what

19   you did is every time you went to make a rollover

20   return, you actually borrowed from the IRA every

21   single time?

22    A   I made a withdrawal from the IRA, yes.

23    Q   You borrowed the money from the IRA to put

24   into your CMA, so you could then write another check

25   to your IRA, correct?

1    A    I withdrew the money, yes.

2    Q    Now, about April of 1998, your fortunes

3    changed, and you were able to sell the Ocean One North

4    property; isn't that true?

5    A    I believe so, yes.

6    Q    And your closing was either on April 30, 1998

7    or May 1, 1998; isn't that true?

8    A    Somewhere around there, yes.

9    Q.    And you received, between you and your wife,

10    approximately $1.2 million, correct?

11    A    Yes.

12    Q    And what you did is you put 96,500 back into

13    the Merrill Lynch IRA, correct?

14    A    Yes.

15    Q    And you took another 96,500 -- well, let me

16    just back up.

17          The million-two you had, you put in a

18    personal account at SunTrust Bank, correct?

19    A    I believe so.

20    Q    And then you wrote a check back for the

21    96,500 to Merrill Lynch to put back 96,500, correct?

22    A    I believe so.

23    Q    And, in addition, what you did is that you

24    took another 96,500 and opened up an account at

25    AmTrust Bank, correct, either 90,000 or 96,500?

1     A    I don't know.

2     Q    And you also opened up an IRA at SunTrust

3  Bank with the proceeds of the sale, correct?

4     A    With the cash I had on-hand, yes.

5     Q    And that was approximately -- the one that

6  you opened at SunTrust was for $90,000, correct?

7     A    I believe so.

8     Q    Now, in regard to your IRAs, you didn't

9  report any of the tax aspects of these 1997 and 1998

10  transactions to the Internal Revenue Service, did you?

11     A    No.

12     Q    And in regard to 1993, sir, isn't it true

13  that you took $700,000 out of your Merrill Lynch IRA

14  in order to acquire from People's Southwest Mortgage,

15  a mortgage and note that was --

16     A    Yes.

17     Q    -- that was owed by Ocean One North, Inc.?

18     A    Yes.

19     Q    And that was a corporation in which you had a

20  50 percent interest; isn't that true?

21     A    My wife and I did, yes.

22     Q    And at that time you were embroiled in a

23  stockholder derivative action with the other

24  shareholder Mr. Jack Amino; isn't that true?

25     A    I don't know the dates.

1    Q    Okay.  But at one you were embroiled in a

2  stockholder derivative action with Mr. Jack Amino,

3  correct?

4    A    I believe so.

5    Q    And that's one of the reasons why, he

6  wouldn't contribute to pay off that mortgage and note

7  that was owed by Ocean One North, Inc.; isn't that

8  true?

9    A    No.

10    Q    You were not personally liable on that Ocean

11  One North, Inc., were you?

12    A    No.

13    Q    Okay.  So what you did was you borrowed

14  $700,000 from your IRA in order to go ahead and

15  acquire that mortgage and note from People's Southwest

16  that was owed by Ocean One North, Inc.; isn't that

17  true?

18    A    Yes, I withdrew the money.

19    Q    Now, did you -- in regard to that note and

20  mortgage, you didn't have -- you had trouble getting

21  the funds to try and replace the $700,000; isn't that

22  true?

23    A    Yes.

24    Q    One of the things you had to do was borrow

25  some money from a lady named Joanne Pison (phonetic)

1 and from the estate of a Mr. Sawyer, correct?

2      A   Yes.

3      Q   And you had to borrow approximately $300,000;

4 isn't that true?

5      A   From them, yes.

6      Q   And in order to get that money, you had to go

7 to a closing where you executed some documents; isn't

8 that true?

9      A   I believe so.

10      Q   And that closing occurred on February 22,

11 1994; isn't that true?

12      A   I don't know.

13      Q   When you went there, part of the security you

14 gave for the $300,000 loan was a mortgage on your

15 home, together with your wife; isn't that true?

16      A   Yes.

17      Q   And that mortgage wasn't recorded until

18 February 22, 1994; isn't that true?

19      A   I don't know when it was recorded.

20      Q   But you did do a deposit slip after you got

21 the monies to try and put the money back in Merrill

22 Lynch; isn't that true?

23      A   I believe I put it back, yes.

24      Q   And you don't have the actual date that

25 Merrill Lynch posted that deposit in 1994, do you?

1    I'm talking about the actual Merrill Lynch statement.

2        A    I don't have it in front of me, no.

3        Q    And you didn't produce it in discovery, did

4    you?

5        A    I thought we did.

6        Q    What you produced was the deposit ticket for

7    the February 22, 1994 stamp; isn't that true?

8        A    I don't know, sir.

9        Q    Okay.  Do you have here today the Merrill

10   Lynch brokerage statement for the month of February of

11   1994?

12       A    I don't have it personally, no.  I don't

13   know.

14           MR. RAKUSIN:  Your Honor, if we may just have

15   the witness determine whether he has the February 1994

16   Merrill Lynch statement here.

17           THE COURT:  I think he's answered the

18   question.  He said he doesn't know.

19           MR. RAKUSIN:  Okay.  You think it's in one of

20   these boxes that are sitting here?

21           THE WITNESS:  Or one of your boxes, yes.

22           MR. RAKUSIN:  I know it's not in one of mine.

23   I want to know if it's in one of your boxes.

24           THE WITNESS:  I don't know, sir.

25           MR. RAKUSIN:  Your Honor, if I may approach

1  the witness?

2          Your Honor, in the third notebook you have

3  Mr. Willis' examination --

4          THE COURT:  When you say "third" notebook, I

5  have eight notebooks or seven notebooks.

6          MR. RAKUSIN:  I'm sorry, it's the one that

7  has --

8          THE COURT:  What volume or what exhibit

9  number?

10          MR. RAKUSIN:  It's tab -- just give me one

11  moment, your Honor.  It would be in the exhibit

12  notebook with Tab 38 or Exhibit 38, your Honor.

13          THE COURT:  I have it.  Now, 38 is not --

14  yes, it is.  I'm sorry.  It is, the front is a

15  designation and then there is a deposition.

16          MR. CHARBONNEAU:  Your Honor, may I approach

17  the witness?

18          THE COURT:  Yes, sir.

19          MR. CHARBONNEAU:  Your Honor, rather than

20  making Mr. Willis go through the exercise of flipping

21  through the exhibit, I'm going show him a miniscript

22  of the same transcript as is marked.

23          THE COURT:  Any objection, Mr. Gleason?

24          MR. GLEASON:  No, your Honor.  I'm just

25  struggling to get my finger on that page.

1          MR. RAKUSIN:  That would be in Tab 38 of the

2    notebook.

3          MR. GLEASON:  Exhibit 38?

4          MR. RAKUSIN:  It's not an exhibit.  We put it

5    in Tab 38, but we didn't produce it as an actual

6    exhibit.  What we did is we simply designated portions

7    of it for reading.

8          THE COURT:  Go ahead.

9    BY MR. RAKUSIN:

10     Q   Sir, do you remember giving a deposition in

11   this matter on December 11, 2007?

12     A   Yes.

13     Q   Do you remember giving this testimony on Page

14   63, commencing at Line 3:

15          Question:  "Okay.  Did you understand there

16   were limits on the number of rollovers you could do in

17   any calendar year?"

18          Answer:  "Out of different IRAs or out of

19   different funds, yes."

20          Question:  "Did you understand there was a

21   limit on how many rollovers you could do in a 12-month

22   period?"

23          Answer:  "I don't believe so."

24          Question:  "Do you have an understanding that

25   you were limited to one rollover per year?"

1          Answer:  "One rollover for a specific IRA

2    fund."

3          Question:  "Is the answer to that question

4    yes?"

5          Answer:  "For a specific one, yes."

6          Do you remember giving that testimony, sir?

7      A    It's here, yes.

8      Q    So you really did know that you were only

9    allowed to do one rollover from a specific IRA back in

10    1997 and 1998; isn't that true?

11      A    I still don't believe so, no.

12      Q    In fact, sir, you made eight major rollovers

13    to the Merrill Lynch IRA within almost a 12-month

14    period; isn't that true?

15          Commencing from February 1997 through to

16    April, a 14-month period you made eight major

17    rollovers?

18      A    Yes.

19      Q    And you withdrew in excess and the rollovers

20    exceeded almost $2 million in total rollovers,

21    correct?

22      A    If you say so, yes.

23      Q    Going back to the transaction in 1994, you

24    actually -- do you remember the date that you were

25    actually able to obtain the funds in order to deposit

1  the $700,000 into your CMA account to in turn deposit

2  that money in your IRA account?

3      A   No, I don't.

4      Q   And there were times, sir, isn't it true,

5  that you would sign deposits slips and attempt to

6  submit checks to Merrill Lynch that you didn't have

7  enough cash monies in the account for the checks to

8  clear?

9      A   I don't know, sir.

10     Q   Well, that's the reason why you kept making

11 the other IRA withdrawals, wasn't it, sir, because the

12 checks that you kept writing to return money from your

13 CMA to the IRA wouldn't clear because you didn't have

14 enough cash; isn't that true?

15     A   Well, that made it, yes.

16         MR. RAKUSIN:  Your Honor, just give me a

17 moment?

18         Your Honor, we have the chart -- do you

19 already have one of these?

20         MR. GLEASON:  Is that the same one you got me

21 yesterday?

22         MR. RAKUSIN:  Yes.

23         MR. GLEASON:  It's a pretty color.

24         MR. RAKUSIN:  Your Honor, we have a chart

25 that we would introduce as the next plaintiff's

 1  exhibit number.

 2          THE COURT:  Any objection?

 3          MR. GLEASON:  I object to the creation of an

 4  exhibit outside of the parameters of your Honor's

 5  order.  We did our exhibit register almost a month ago

 6  and agreed on exhibits.

 7          THE COURT:  Do you have any objection that

 8  the chart accurately reflects the transactions that

 9  are reflected in other documents that have been

10  introduced in evidence?

11          MR. GLEASON:  I could have no way of knowing

12  that, your Honor.  I received this yesterday.  Your

13  Honor sees the volumes of documents.  It was not

14  possible for me to have my expert or anyone else

15  double-check it.

16          THE COURT:  I will let you do that over

17  lunch, so remind me right after lunch.

18          MR. RAKUSIN:  Your Honor, if I might just

19  have a moment with Mr. Charbonneau?

20          THE COURT:  Yes, sir.

21          And by the way, Mr. Charbonneau --

22          MR. CHARBONNEAU:  Yes, sir.

23          THE COURT:  -- and Mr. Rakusin, it would be

24  helpful if you could show Mr. Gleason exactly where

25  the documents are that substantiate the consents of

1  this exhibit.

2          MR. CHARBONNEAU:  Happy to do it, your Honor.

3          THE COURT:  Okay.  Thank you.

4          (Inaudible discussion off the record between

5  Mr. Rakusin and Mr. Charbonneau.)

6          THE COURT:  Anything else?

7          MR. RAKUSIN:  Just one brief subject area,

8  your Honor.

9  BY MR. RAKUSIN:

10     Q   Mr. Willis, have you received any money from

11  your Merrill Lynch IRA, the AmTrust IRA, or the

12  Fidelity Federal IRA after the filing of your petition

13  for relief?

14     A   What would that date -- I presume your saying

15  from February of --

16     Q   2007.

17     A   Yes.

18     Q   And approximately how much money have you

19  taken out or withdrawn from those three IRAs?

20     A   I have had a mandatory requirement to take

21  out $60,000 plus in 2007 and 60,000 plus in 2008.  I

22  haven't taken all of 2008 out yet.

23     Q   So how much approximately do you think you've

24  actually withdrawn as of today?

25     A   Maybe a hundred-ten-thousand.

1        MR. RAKUSIN:  Your Honor, I don't believe I

2    have any further questions of this witness at this

3    time.

4        THE COURT:  Redirect -- or I'm sorry, cross?

5        MR. GLEASON:  No thank you, your Honor.

6        THE COURT:  You can be excused.

7        Next witness?

8        MR. GLEASON:  I just thought perhaps it might

9    be a --

10       THE COURT:  Let's see what else they have.

11       MR. GLEASON:  Okay.  I was just going to say,

12   maybe they can start showing me those documents,

13   but --

14       THE COURT:  They will do it during lunch.

15   Let's get as much -- unless you all are confident

16   you're going to be done this afternoon, let's push

17   forward.  If you're confident you're going to be done,

18   then we can break now because he won't -- Mr. Gleason

19   would like you to show him real quick where the backup

20   for this exhibit is.

21       MR. RAKUSIN:  Judge, we are going to rest at

22   this point on the plaintiff's case and what we have in

23   evidence, with the exception of --

24       THE COURT:  This document.

25       MR. RAKUSIN:  Right, that document, and we

1  requested designations into -- I want to point out on

2  thing to the Court, when we gave the Court the Tabs

3  36, 37, and 38, we had included, because we didn't

4  have the motion in limine ruling from yesterday, we

5  included the earlier Irving Silver deposition with

6  pages and lines to designate, so my suggestion is the

7  Court simply removes that and doesn't take it into

8  consideration in light of yesterday's ruling, and then

9  we are not actually putting in the other two

10  depositions as exhibits, but we thought for

11  convenience we would just leave them in under those

12  tabs to make it easy for the Court in digesting all of

13  the voluminous materials.

14       THE COURT:  As to 36 are you offering it and

15  having me refuse it based on my ruling yesterday?

16       MR. RAKUSIN:  Yes, your Honor, I guess for

17  the record, that would probably be the best way to

18  handle that.

19       THE COURT:  Okay.  For the July 23rd.

20       For the October 17th, which is Exhibit 37,

21  any objections other than those that you raised

22  yesterday, Mr. Gleason?

23       MR. GLEASON:  Judge, I just have to ask

24  whether we are putting in the entirety of Exhibit 37,

25  because I have -- my exhibit 37 just has designated

1  lines and page numbers and has yellow highlights, so I

2  don't know --

3        THE COURT:  I've assumed that it is only

4  those portions they have designated that they are

5  seeking to introduce into evidence.

6        MR. RAKUSIN:  That's correct, your Honor.

7        MR. GLEASON:  Judge, it being non-jury and

8  having some experience with your Honor's post-hearing

9  procedures, can we just put the whole thing in and

10 argue over it later?

11       Your Honor has already ruled it comes in.  I

12 can argue over competency, but the witness isn't here,

13 so I'm just going to have to point out page numbers

14 and line numbers.

15       THE COURT:  I'm only going to receive that

16 which they are moving into evidence.

17       MR. GLEASON:  Fine.  Thank you, sir.

18       MR. CHARBONNEAU:  Your Honor, may we have a

19 moment on that?

20       (Inaudible discussion off the record between

21 Mr. Rakusin and Mr. Charbonneau.)

22       MR. RAKUSIN:  Judge, we're only going to move

23 in what we think we can vouch for the pages and lines

24 we've designated.

25       THE COURT:  Okay.  Now, as to 38, that's

1  Mr. Willis' deposition.

2          The whole thing can come in or it can be

3  portions that you've designated, which do you wish?

4          MR. RAKUSIN:  Just what we've designated,

5  your Honor, particularly as to Mr. Willis.

6          THE COURT:  Okay.  I will receive those

7  portions of 38.

8          (Thereupon, the Court received designated

9  portions of Exhibit No. 38 into evidence.)

10         THE COURT:  Any objection to that, Mr.

11  Gleason, those portions they've designated?

12         MR. GLEASON:  No, your Honor, but back to 37,

13  I think it is my privilege under the rules to require

14  the entire document --

15         THE COURT:  You can have -- I'm sorry, I

16  thought -- I didn't realize what you were saying is

17  you wanted the entire document in.

18         MR. GLEASON:  Yes, please.

19         THE COURT:  Okay.  I will receive the entire

20  37.  He's asked to cross-designate the rest.

21         (Thereupon, the Court received Exhibit No. 37

22  into evidence.)

23         MR. RAKUSIN:  I understand, your Honor.

24         THE COURT:  Okay.  Good.  We will take a

25  lunch break.

1        Mr. Gleason, one thing, yesterday you made a

2   representation that this deposition of Mr. Silver

3   dated July 23rd did not have any indication it was a

4   2004 deposition.  It does, and it's noticed.  It's not

5   filed in the bankruptcy case, but it does says "2004"

6   deposition.

7        MR. GLEASON:  I'm happy to look at the

8   transcript, Judge.  My intent was to say, there's no

9   notice in this court file of a 2004 Exam.

10       THE COURT:  Okay.  That's not what you said,

11  and --

12       MR. GLEASON:  I apologize.

13       THE COURT:  -- you better be careful, because

14  I take it very seriously if you make a

15  misrepresentation to the Court.

16       MR. CHARBONNEAU:  Judge, before we adjourn,

17  yesterday the Court asked me to deliver an extra set

18  of exhibits for your law clerk.  They are stacked

19  right next to her --

20       THE COURT:  Thank you.

21       MR. CHARBONNEAU:  -- if she wants to follow

22  along, or not.

23       THE COURT:  Good.  We'll be recess.

24       MR. GLEASON:  What time will we resume, your

25  Honor?

1           THE COURT:  One, unless you all are going --

2    how long is your case?

3           MR. GLEASON:  Pretty short.

4           THE COURT:  How long?

5           MR. GLEASON:  Probably an hour.

6           THE COURT:  Well, then we can start back up

7    probably at 1:30 if you all would like.

8           MR. GLEASON:  I'm sorry, I have two

9    witnesses, probably two hours.

10          MR. CHARBONNEAU:  One would be preferable.

11          THE COURT:  Then we will start back up at

12   one.

13          (Whereupon, a lunch recess was taken from

14   11:45 a.m. until 1:00 p.m., after which there was a

15   change of court reporters.)

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2

3  STATE OF  FLORIDA:
   COUNTY OF PALM BEACH:
4

5          I, Anna M. Meagher, Shorthand Reporter and

6  Notary Public for the State of Florida at Large, do

7  hereby certify that the foregoing proceedings were

8  taken before me, in the cause, at the time and place,

9  and in the presence of the Court and counsel as stated

10 in the caption hereto on Page 1 hereof; that the

11 foregoing computer-assisted transcription, consisting

12 of pages numbered 1 through 47, inclusive, is a true

13 and accurate record of my Stenographic notes taken at

14 said proceedings.

15         I further certify that I am not of counsel, I

16 am not related to nor employed by any attorney in this

17 case.

18         Dated this 9th day of December 2008.

19

20

21

22                      _____

23 My Commission Expires:  Anna M. Meagher, Notary Public
   December 7, 2008        State of Florida at Large
24 Commission #DD355554

25

OUELLETTE & MAULDIN COURT REPORTERS
(305)358-8875