## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION
### www.flsb.uscourts.gov

*In re:*

ERNEST W. WILLIS,

      Debtor.

_____/

And

In re:

ERNEST W. WILLIS,

      Debtor.

_____/

DEBORAH C. MENOTTE, Trustee
in Bankruptcy for Ernest W. Willis,

      Plaintiff,

vs.

ERNEST W. WILLIS,

      Defendant.

_____/

CASE NO.: 07-11010-BKC-PGH
Chapter 7 Proceeding

CASE NO.: 07-11010-BKC-PGH
Chapter 7 Proceeding

Adv. Proc. No.: 08-01383-PGH-A

## TRIAL BRIEF OF THE TRUSTEE, DEBORAH C. MENOTTE AND CREDITOR, RED REEF, INC. ON ISSUE OF APPLICATION OF 11 U.S.C. §522, 26 U.S.C. §4975 AND 26 U.S.C. §408 TO DEBTOR'S CLAIMED IRA EXEMPTION

### STATEMENT OF FACTS

A. **Procedural History**

    1.    The case was commenced by the filing of a voluntary petition by Ernest W. Willis

FTL:3024064:1

(the "Debtor" or "Willis" or "Mr. Willis")[1] under Chapter 7 of Title 11, United States Code, on February 16, 2007. (DE #1). See Pretrial Order, ¶ 7.

2.  Schedules, including a schedule of assets and claimed exemptions, were filed on March 14, 2007. (DE #13); see also Pretrial Order, ¶ 7. On his Schedule "C", the Debtor claimed his IRA accounts at Merrill-Lynch (the "Merrill Lynch IRA"), AmTrust Bank (the "Amtrust IRA") and Fidelity Federal Savings and Loan (the "Fidelity Federal IRA") (collectively, the Merrill Lynch IRA, Amtrust IRA and Fidelity Federal IRA are the "IRA Accounts")[2] as exempt pursuant to FSA § 222.21.

3.  On July 30, 2007, Red Reef, Inc. ("Red Reef")[3] filed its objections to exemptions (DE #80, #82), and the Trustee, Deborah C. Menotte (the "Trustee") filed her objections to exemptions. (DE #81). See Pretrial Order, ¶ 9.

4.  The Debtor amended his exemptions claiming the full value of the IRA Accounts as exempt pursuant to 11 U.S.C. 522(b)(3)(C). (DE #349) The Trustee filed a Motion to Strike the Amended Exemptions (DE #352). On August 8, 2008, the Court entered the *Agreed Order Denying Trustee's Motion to Strike Debtor's Amended Exemptions (C.P. # 349) And In The Alternative, Objection to Debtor's Amended Exemptions* (D.E. 404) which provides that "[t]he Debtor's Amended Schedule C (C.P. # 349) amends and supersedes all prior grounds asserted by the Debtor for exemption" of IRA Accounts. See Pretrial Order, ¶ 10.

5.  Red Reef, Inc. filed its Objections to the Amended Exemptions (DE #378) on the basis that the IRA accounts do not comply with the requirements delineated in 26 U.S.C. § 408 because the Debtor violated the provisions of 26 U.S.C. § 408(a)(1) including limitations on the amounts which can be deposited and withdrawn from an IRA; the accounts did not receive valid rollovers pursuant to 26 U.S.C. § 408(a)(1); the Debtor did not timely rollover funds into the IRA Accounts pursuant to 26 U.S.C. § 408(d)(3)(A)(i); the IRA accounts are not IRS-qualified; and the Debtor engaged in prohibited transactions pursuant to 26 U.S.C. § 408(e)(2)(a) and 26 U.S.C. §

---

1 See ¶ 1 of Consolidated Pretrial Order on Objection to Exemptions and Amended Exemptions by Red Reef, Inc. And Trustee, Deborah C. Menotte And Verified Complaint for Injunctive Relief and For Accounting (Adversary Case No. 08-01283; D.E. # 26) (the "Pretrial Order").
2 See Pretrial Order, ¶¶ 2, 3, 4, and 5.

4975(c).  (D.E. #s 82 and 378).

6.    The Trustee filed Trustee's Objection to Debtor's Amended Exemptions (DE. # 379) on the basis that the funds in the IRA Accounts are not in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986 as required by 11 U.S.C. § 522(b)(3)(C).

7.    The Trustee withdrew her objection to the Amtrust IRA and Fidelity Federal IRA (D.E. # 406).  Red Reef still maintains its objections to the Amtrust IRA and Fidelity Federal IRA.

8.    On December 1, 2008, Red Reef, Inc., filed the Direct Testimony of Expert Witness Sharon Quinn Dixon, Esq., (DE # 509) which is incorporated herein by reference.

9.    On December 3, 2008, this Court held a trial on Red Reef's and the Trustee's Objections to the Debtor's claimed exemptions in the IRA Accounts pursuant to 11 U.S.C. § 522 and the Trustee's Adversary Proceeding for Injunction and Accounting.

**B.    The Debtor**

10.    Ernest W. Willis was born on October 22, 1934 and was a Banker for 35 years, ultimately serving as President and CEO of Pathway Financial, in Chicago, Illinois.  See Pretrial Order, ¶ 13.  By 1989, Mr. and Mrs. Willis formed Beacon Property Management, Inc. ("Beacon"). See Pretrial Order ¶ 14.

**C.    The Merrill Lynch IRA Account and the Joint CMA Account**

11.    During the period 1993 through 2006, Ernest Willis only had a single IRA account at Merrill Lynch.  See Pretrial Order, ¶ 31.  Initially, it was Account No. xxx-x4781 and later changed to Account No. xxx-x9317 in 2004.  See Pretrial Order ¶ 31.

12.    The Debtor testified at trial that in addition to the IRA account at Merrill Lynch, he also maintained a combination cash management and brokerage account at Merrill Lynch (hereinafter, the "CMA"), from which he had the ability to write checks.  See E. Willis Test. I, Page 18, lines 8-14.  Mr. Willis admitted that he had the ability, to the extent that there was a section of the Merrill Lynch statements that showed him how much cash was available, to write checks.  See E. Willis Test. I, Page 18, lines 15-19.  Mr. Willis used the CMA to hold stocks and to draw funds for

---

3 See Pretrial Order, ¶ 1.
FTL:3024064:1

living expenses and other utilization purposes. He deposited the stocks in the CMA and then at certain times borrowed or drew money against the value of his securities by writing a check, which was permitted by Merrill Lynch. See E. Willis Test. II, Page 35, lines 6-20.

**D.     Willis' Relationship To, and Ownership of, Ocean One and Beacon**

13.     Ocean One North, Inc. ("Ocean One") was a corporation owned by Willis and his wife Sunday Willis. Willis testified that Ocean One paid its bills with income from rentals and deposits from Willis personally. Willis deposited funds into the account for Beacon Property Management ("Beacon") because Ocean One did not have its own account. See E. Willis Test. II, Page 27, lines 15-21. The funds for the Beacon loans came from his personal checking and/or CMA. See Willis Test. II, Page 28, lines 21-24. Willis testified that he did not believe the deposits he made to the Beacon account from his personal checking account were loans because, "I consider it an advance to the company." See Willis Test. II, Page 27, line 22 to Page 28, line 3. According to the Debtor, the books and records of Beacon reflect the transactions for the benefit of Ocean One and the books for Beacon show the transactions as a liability in favor of Mr. and Mrs. Willis. See E. Willis Test. II, Page 28, lines 11-20.

14.     Willis admitted loaning money to Ocean One through Beacon. See Willis Test. II, Page 62, lines 16-19. Willis testified that the difference between a loan and an advance is documentation that the money is owed back. He did not bother to create any paperwork for the loan to Ocean One because he was the person lending the money and receiving it on behalf of Ocean One. See Willis Test. II, Page 62, line 20 to Page 63, line 11. Ocean One received the benefit of the loan, not himself. See Willis Test. II, Page 63, lines 12-20. Willis testified that Ocean One owed the loan money back to himself and his wife, and the loan was carried on Ocean One's books and records. See Willis Test. II, Page 63, line 21 to Page 64, line 1. The Debtor also loaned money to Beacon Property Management. See E. Willis Test. II, Page 64, lines 2-8.

**E.     The Peoples Southwest Mortgage**

15.     Mr. Willis was embroiled in a stockholder derivative action, concerning Ocean One North, Inc., with Mr. Giacomino. See E. Willis Test. I, Page 32, lines 1-4. The Ocean One Property was encumbered by a mortgage that was held at that time by Peoples Southwest Limited Real Estate

FTL:3024064:1

Partnership ("Peoples Southwest"). Willis and Mr. Giacomino entered into a Settlement Agreement, pursuant to which Peoples Southwest agreed to assign its mortgage for the sum of $805,000.00. See Pretrial Order ¶ 18.

16.    Giacomino reneged on the settlement agreement and Willis had to come up with the money to purchase the Peoples Southwest mortgage on his own. See Willis Exam II, page 25, lines 6 to 12. Willis testified that he had agreed to give a $50,000 deposit to Peoples Southwest as part of this agreement and would pay $792,500 to obtain the assignment of the loan from Peoples Southwest before December 1993. See Willis Exam II, page 25, lines 13 to 25 and page 26, lines 1 to 2.

17.    Willis testified that in 1993, he was having trouble obtaining the money to pay off the mortgage since he had not anticipated paying the entire Peoples Southwest mortgage. See Rule 2004 Willis Exam II, page 48, lines 13 to 20. Willis testified that the assignment of mortgage was taken in his name because he had to come up with the money. See Willis Exam II, page 23, lines 5 to 12. Mr. Willis had to scramble to raise all the funds necessary to take an assignment of the Peoples Southwest mortgage as he had not anticipated paying the entire amount. Pretrial Order ¶ 20.

**F.    Willis Consolidates $700,000.00 Into His Merrill Lynch IRA To Acquire the Peoples Southwest Mortgage**

18.    In late 1993, Ernest Willis began to consolidate a number of his smaller IRA accounts other financial institutions by rolling them directly into the Merrill Lynch IRA account. In a four month period at the end of 1993, Willis consolidated various other IRA accounts into his Merrill Lynch IRA account. See Pretrial Order ¶ 33, 35; See Rule 2004 Willis Exam II, page 83, line 18 to page 90, line 8. Willis testified that he was trying to resolve matters with Peoples Southwest while trying to consolidate all his IRA's into his Merrill Lynch IRA. See Willis Exam II, page 89, lines 20 to 25 and page 90, lines 1 to 2.

**G.    Loan of IRA Funds for Mortgage Acquisition**

19.    By December of 1993, Ernest Willis had finally accumulated enough funds in his IRA account to pay off the Peoples Southwest mortgage. Willis admitted that he borrowed $700,000 from the Merrill Lynch IRA in order to acquire the People's Southwest mortgage and note owed by Ocean One North, Inc.

FTL:3024064:1

Q.   So what you did was you borrowed $700,000 from your IRA in order to go ahead and acquire the mortgage and note from People's Southwest that was owed by Ocean One North, Inc., isn't that true?

A.   Yes, I withdrew the money.

See E. Willis Test. I, Page 31, lines 12-18; Page 32, lines 13-18.

20.   Mr. Willis transferred the funds necessary to purchase the People's Southwest mortgage from the Merrill Lynch IRA to his joint account with his wife, then transferred to the escrow agent for Peoples Southwest mortgage. Mr. Willis sent a fax cover sheet dated Monday, December 13, 1993 to Irving Silver at Merrill Lynch. See Willis Exam, page 35, line 23 to page 36, line 4. Mr. Willis enclosed wire transfer instructions on December 13, 1993, from his Beacon Property Management Office. See Willis Depo, page 36, lines 10 to 19. The $700,000.00 was transferred from the Sun Bank account of Mr. and Mrs. Willis to the escrow account maintained by Greenberg Traurig for Mr. Willis' acquisition of the People's Southwest mortgage. Mr. Willis, maintained that the Sun Bank account with his wife, Sunday. It was Account Number 0399545854415. See Willis Exam II, page 33, lines 13 to page 34, line 1; see also Pretrial Order ¶ 26. In December, 1993, Mr. Willis sent an authorization letter to Merrill Lynch to transfer $700,000.00 in funds from his Merrill Lynch IRA to a Sun Bank account (Account Number xxxxxxxx4415) which was titled jointly with Mrs. Willis. Mr. Willis testified that on December 20, 1993 Merrill Lynch wired $700,000 from the Merrill Lynch IRA to a personal account at SunTrust (in the name of Mr. And Mrs. Willis), which he used to acquire the mortgage on Ocean One's property. See Red Reef's and the Trustee's Ex. 5 (hereinafter, Red Reef's and the Trustee's Exhibits shall be referred to as "Red Reef's Ex.") and Red Reef's Ex. 9; see also E. Willis Test. II, Page 64, line 13 to Page 65, line 19. Mr. Willis testified that he made his final payment for the acquisition of the People's mortgage on December 20, 1993. See E. Willis Test. II, Page 31, lines 9 to 12; see also Pretrial Order ¶ 54.

H.   **Closing and Assignment of People's Southwest Mortgage and Note to Mr. Willis**

21.   On Monday, December 13, 1993, there was a loan closing in escrow pursuant to the

FTL:3024064:1

Settlement Agreement. See Red Reef's Ex. 7 (closing statement between Peoples Southwest Real Estate Limited Partnership and Ernest Willis along with a release); See also Willis Exam II, page 36, line 25 to page 37, line 19. Mr. Willis personally received assignment of the Peoples Southwest mortgage from Peoples Southwest Mortgage Limited Partnership. See Red Reef's Ex. 8, Pretrial Order ¶ 22.

**I.    Failed Attempt to Place Note and Mortgage in IRA**

22.    Mr. Willis testified that he began to investigate the possibility of putting the People's mortgage into his IRA in the early part of December 1993. See E. Willis Test. II, Page 32, line 24 to Page 33, line 11. After the closing, Ernest Willis attempted to place the mortgage and note directly into his IRA. When asked why he would want to put a note into his IRA in 1993, Mr. Willis testified "it might have seemed like something to do." See Willis Exam II, page 46, lines 3 to 9 and page 47, lines 5 to 9.

23.    On Tuesday, December 14, 1993, Irving Silver sent a fax to Harry Ross, Esq., the attorney for Ernest Willis. Willis Exam II, page 46, lines 13 to 19. According to the fax, Merrill Lynch informed Harry Ross that it needed a legal opinion for Ernest Willis sent to Merrill Lynch Retirement Plan Operations in order to put the note of Ocean One North, Inc. and Matthew Giacomino into Mr. Willis' IRA account. See Willis Exam II, page 47, lines 5 to 9. Harry Ross, Mr. Willis' personal attorney since 1992 (hereinafter "Mr. Ross") testified that Mr. Willis asked him to render an opinion addressing whether the People's mortgage could be put into the Merrill Lynch IRA. However, Mr. Ross declined to give his opinion because he was not a tax expert and also because he did not believe the transaction would be correct. See transcript to the December 3, 2008 trial proceedings, Harry Ross testimony (hereinafter "H. Ross Test."), Page 8, line 15 to Page 9, line 5; see also Red Reef's Ex.9, at no time were the mortgage and note placed in the Merrill Lynch IRA.

**J.    In 1994, The Debtor Attempts To Return Borrowed Funds To The IRA Account**

24.    Mr. Willis testified that the sixtieth day after December 20, 1993 would be Friday, February 18, 1994. The Merrill Lynch records and the public records of Palm Beach County, Florida, reflect that the loan monies were rolled over within sixty (60) days of December 20, 1993.

FTL:3024064:1

-7-

<u>See</u> E. Willis Test. II, Page 66, lines 9 to 23.  Mr. Willis testified that he had trouble gathering the funds to timely replace the $700,000 withdrawn from the Merrill Lynch IRA.  <u>See</u> E. Willis Test. I, Page 32, lines 19 to 23. On Tuesday, February 22, 1994, the Debtor borrowed funds from Joan Pison, who took a mortgage on his homestead for $100,000.00; The Estate of James A. Sawyer, $200,000.00 another mortgage; Nancy Willis, his sister, for $100,000.00 unsecured; Richard Willis, his late brother, for $100,000.00 unsecured; Robert Sirotek, a friend, for $100,000, unsecured.  <u>See</u> Pretrial Order ¶ 27.

25.    In order to secure the loan, on or about February 22, 1994 Mr. Willis executed documents giving $300,000.00 in mortgages on his home with his wife.  <u>See</u> E. Willis Test. I, Page 32, line 24 to Page 33, line 16.

26.    Monday, February 21, 1994, was the national holiday of President's Day.  <u>See</u> Pretrial Order ¶ 36.  The $200,000.00 from the Sawyer Estate was apparently not provided to Willis until February 22, 1994.  On or about Tuesday, February 22, 1994, the estate of James A. Sawyer recorded a mortgage on the homestead property of Ernest W. Willis.  The amount of the mortgage was for $200,000.00.  <u>See</u> Red Reef's Ex. 10.  Furthermore, on February 22, 1994, Ernest and Sunday Willis executed a promissory note in favor of the estate of James A. Sawyer which promised to repay the $200,000.00 with 10% interest.  <u>See</u> Red Reef's Ex. 10.  On Tuesday, February 22, 1994, Ernest Willis's wife, Sunday Willis, also executed an affidavit.  It states that the purpose of the affidavit was "<u>to induce</u> the Estate of James A. Sawyer, deceased to lend the sum of $200,000.00 to Ernest W. Willis and Sunday S. Willis, his wife."  <u>See</u> Red Reef's Comp. Ex. 10.  Mr. Willis also obtained a $100,000.00 mortgage on his homestead from Joann Pison. As with the Sawyer Estate mortgage, the mortgage was executed on February 22, 1994.

27.    The deposit records show that Ernest Willis did not deposit the $700,000.00 into the Merrill Lynch IRA until, at the earliest, at least Tuesday, February 22, 1994, some 64 days after the date of withdrawal from the IRA. Mr. Willis testified he returned the withdrawn $700,000 to the IRA after he received it, but he could not recall the date of the deposit and he did not have the Merrill Lynch statement reflecting the posting of that deposit.  <u>See</u> E. Willis Test. I, Page 33, line 20 to Page 34, line 2.

28.     Ernest Willis signed a $ 498,000.00 deposit ticket to the IRA account on Tuesday, February 22, 1994. It was listed as a check and signed by Ernest Willis. The deposit ticket was stamped at 1:53PM on February 22, 1994. See Debtor's Exh. "T"; see also E. Willis Test. II, Page 67, line 24 to Page 68, line 6; Page 68, line 23 to Page 69, line 2. Mr. Willis testified that he knew the $498,000 deposit on February 22, 1994 would not be posted to the account until the next day because it was submitted after 1:00. See E. Willis Test. II, Page 69, lines 3 to 6; lines 12 to 15.

29.     Mr. Willis admitted that the number of days between December 20, 1993 and February 23, 1994 is 64 days. He knew the funds had to be returned within 60 days to meet the rollover requirement. See E. Willis Test. II, Page 69, line 18 to Page 70, line 1. Mr. Willis admitted that he did not return the $700,000 to the IRA within 60 days, contrary to his certification:

> Q.     When you said in your certification you returned the money within 60 days, you didn't actually return the money from the $700,000 loan within 60 physical days of December 20, 1993; isn't that true sir?
>
> A.     If those are the right dates, yes.

See E. Willis Test. II, Page 73, lines 8 to 13.

### K.     Willis Used His Merrill Lynch IRA For His Own Personal Use and Engaged in Multiple "Rollovers" In 1997 and 1998

30.     Ernest Willis stipulated that in 1997 and 1998 he made multiple rollovers into his Merrill Lynch IRA account within a 12-month period. See Pretrial Order ¶ 56. In 1997 and 1998, Ernest Willis repeatedly utilized or loaned himself the IRA funds and frequently repaid or returned some of the moneys to the IRA account. Mr. Willis admitted that he made eight major rollovers to the Merrill Lynch IRA within a 14 month period commencing February 1997 to April 1998 and the total exceeded almost $2 million. See E. Willis Test. I, Page 37, lines 12-22. Mr. Willis admitted that the reason he kept making IRA withdrawals was because the CMA account did not have sufficient funds to cover the checks he wrote returning the funds from the CMA account to the IRA. See E. Willis Test. I, Page 38, lines 10-15. Mr. Willis clearly testified that he had borrowed from the IRA and transferred the funds to the CMA account every time he would write a check from the CMA back to the IRA.

FTL:3024064:1

> Q.     Now, sir, isn't it true that effectively what you did is every time you went to make a rollover return, you actually borrowed from the IRA every single time?
>
> A.     I made a withdrawal from the IRA, yes.
>
> Q.     You borrowed the money from the IRA to put into your CMA, so you could then write another check to your IRA, correct?
>
> A.     I withdrew the money, yes.

See E. Willis Test. I, Page 29, line 18 to Page 30, line 1. Mr. Willis admitted that he was check-swapping between the IRA account an the non-IRA account in order to try and comply with the 60-day rollover rule. See E. Willis Test. I, Page 28, lines 13-16.

> Q.     So you were swapping checks between the IRA account and the non-IRA account in order to try and comply with the 60-day rollover rule, correct?
> A.     Yes.

See E. Willis Test. I, Page 28, lines 13-16.

31.     Mr. Willis admitted that if the records as to cash balances in 1997 and 1998 were lower than the amounts of the CMA checks, that there would not be sufficient funds to cover the checks back to the IRA.

> Q.     And you'd agree, sir, generally that if we looked at the records as to the cash balances, where the cash balances in 1997 and 1998 were lower than the amounts of your check, that you would have had to put funds in there to cover the checks that you wanted to write back to the IRA, isn't that true?
>
> A.     Yes.

See Willis Test. II, Page 62, lines 7-13.

## L.     Willis Continues To Use His IRA To Cover Losses In His CMA Account at Merrill Lynch

32.     The borrowing from the IRA started because in January of 1997, Willis suffered significant investment losses in his joint personal stock brokerage account at Merrill Lynch, which he held with his wife (the "CMA account"). Mr. Willis conceded that in late 1996 the Merrill Lynch CMA account was heavily invested in stocks from Mercury Finance Company in Ohio. See E. Willis Test. I, Page 18, lines 20 to 25.

FTL:3024064:1

33.    Willis lost approximately $320,000.00 in value of the Mercury Finance Co. stock in the 31 day period between December 31, 1996 and January 31, 1997.    See Plaintiff's Comp. Exh."24" Vol. I Tab 1 (VL 0606080000640); (VL0606080000626). As of December 31, 1996, Mr. Willis had $386,499 worth of stocks in Mercury Finance Company. At that time the value of the stocks were $12.25 per share. See Red Reef's Ex.24 Vol. 1 Tab 1 (VL 0606080000640); see also E. Willis Test. I, Page 19, line 17 to Page 20, line 4; Page 20, lines 9 to 11; Red Reef's Ex.. 24 Vol. I Tab 1 (VL 0606080000640).    At the time, the total CMA account at Merrill Lynch, which was margined, had a gross net market value of $207,385.00.    See Red Reef's 24 Vol. I Tab 1 (VL 0606080000637). However, in January 1997, the value of the Mercury Finance stock plummeted downward. Its value fell from $12.25 per share as of December 31, 1996 to $2.12 per share as of the January 31, 1997 Merrill Lynch brokerage statement.    See Red Reef's Ex. 24 Vol. 1 Tab 1 (VL 0606080000640) and Red Reef's Ex. "24" Vol. 1 Tab 2 (VL 0606080000626). The gross dollar value of the Mercury Finance stock dropped from $386,499.75 on December 31, 1996 to $67,644.00 on January 31, 1997.    See Red Reef's "24" Vol. I Tab 1 (VL 0606080000637) and Red Reef's. 24 Vol. 1 Tab 2 (VL 0606080000623).    Mr. Willis conceded that the Mercury Finance stocks had dropped in value by approximately $320,000. See E. Willis Test. I, Page 22, line 24 to Page 23, line 4.

34.    By January 31, 1997, the overall Merrill Lynch brokerage statement for the CMA account reflected that it had a negative value of minus $112,395.00. Mr. Willis admitted that the drop in value of the Mercury Finance stocks caused a shortfall in the CMA account. See E. Willis Test. I, Page 23, lines 5 to 7; see also Red Reef's Ex. "24" Vol. I Tab 2 (VL 0606080000623).

35.    Willis had no available funds with which to cover the shortfall in the CMA account except to borrow from his Merrill Lynch IRA.  In February 1997, he directed Merrill Lynch to distribute $230,000.00 from the IRA Account and, in turn, he deposited it into the CMA account. Mr. Willis admitted that the purpose of the $230,000 IRA withdrawal, actually posted on February 7, 1997 was to borrow funds from the IRA to cover the shortfall in the CMA. See E. Willis Test. I, Page 24, lines 16 to 20. On the February 28, 1997, the Merrill Lynch brokerage account statement reflected that, after the $230,000.00 transfer from the IRA to the CMA account, the two accounts had

FTL:3024064:1

the following values:

| | Account | Value |
|---|---|---|
| (a) | IRA account | $449,386.00 |
| (b) | CMA account | $148,372.00 |

See Red Reef's 24 Vol. I Tab 2 (VL 0606080000610 and VL 0606080000621).

**M.  Multiple Transfers in 1997 and 1998**

       **1.  The $230,000.00 Withdrawal**

       36.  Between February 1997 and April 1998, the Debtor did not have sufficient funds with which to pay back the initial loan from the IRA account cover the shortfall in the CMA Account.

       **a.  Withdrawal on February 7, 1997 From IRA**

       37.  On Wednesday, February 5, 1997, Willis requested that Merrill Lynch transfer $230,000.00 from the Merrill Lynch IRA account to the CMA account. [4]  Merrill Lynch posted the transfer from the IRA account on Friday, February 7, 1997 and credited the CMA account on Friday, February 7, 1997. Mr. Silver testified that, according to the statements, Mr. Willis made a $230,000 withdrawal from the IRA. This transaction was posted on February 7, 1997. See Red Reef's Comp. Ex.. "24" Vol. I Tab 2 (VL 0606080000621); Silver Depo, Page 14, lines 9-14; Page 14, line 18 to Page 15, line 8. Merrill Lynch did not transfer the funds directly to another trustee. The funds were paid to the CMA Account. See Willis Exam II, page 67, line 21 to page 68, line 3. Mr. Silver testified that according to the statement postings, Mr. Willis made a $230,000 deposit to the CMA account on Friday, February 7, 1997. See Red Reef's Comp. Ex. 24 Vol. I Tab 2 (VL 0606080000613); Silver Depo, Page 15, line 25 to Page 16, line 7. According to Mr. Silver, the posting of the $230,000 withdrawal from the IRA and the $230,000 deposit to the CMA occurred on the same day, February 7, 1997. See Silver Depo, Page 15, lines 8-11. Once the money was placed in his non-IRA account at Merrill Lynch in the name of Sunday Willis and himself, Mr. Willis had

---

[4] Irving Silver, the Debtor's Account Manager, produced a request for a distribution of funds on Wednesday, February 5, 1997 for $230,000.00. See Red Reef's Comp. Ex. 21, (IS 12307-00059) to the Rule 2004 Willis Exam II. Mr. Willis signed the transfer form in the amount of $230,000.00 dated Wednesday, February 5, 1997. See Red Reef's Comp. Ex. "11" (IS 72307-00087). See Willis Exam II, page 67, lines 12 to 20.

FTL:3024064:1

complete and unfettered control of the CMA account which contained the $230,000.00. See Willis Exam II, page 57, lines 15 to 23.

### b. Deposit on April 11, 1997 to IRA

38. Mr. Willis admitted that he wanted to replace the $230,000 to the IRA within 60 days to avoid tax consequences, but he had no other source to get the money other than from his Merrill Lynch IRA. See Willis Test. I, Page 24, line 25 to Page 25, line 7. Mr. Silver testified that according to the Merrill Lynch statements, Mr. Willis made a $230,000 deposit into the IRA account which was posted on Friday, April 11, 1997. See Red Reef's Comp. Ex. 24 Vol. I Tab 2 (VL 0606080000593); Silver Depo, Page 17, line 13 to Page 18, line 1. This was 63 days after the withdrawal.

39. Willis prepared a deposit ticket for $230,000.00 by which a check was deposited into the Merrill Lynch IRA account. Willis testified that he filled out the amount of $230,000 in Debtor's Exhibit J. See E. Willis Test. II, Page 49, lines 18-22. While the actual deposit slip is hand-dated for Tuesday, April 8, 1997, the time stamp on the Merrill Lynch deposit form shows 1:21PM on Thursday, April 10, 1997. See Debtor's Exhibit "J". Ernest Willis did not list it as a "rollover deposit" or "direct rollover from a qualified plan." Instead, he listed it under "IRA non-Deductible".

40. Mr. Silver testified that according to the Merrill Lynch statements, on Monday, April 14, 1997, a check in the amount of $230,000 was debited to the CMA account. See Red Reef's Comp. Ex. "24" Vol. I Tab 2 (VL 0606080000586); Silver Depo, Page 16, line 12 to Page 17, line 12.

### c. Funds From IRA Used to Cover the $230,000.00 Deposit

41. Mr. Willis admitted that, in order to replace the $230,000 IRA withdrawal in February, in April 1997 Willis withdrew an additional $240,000 from the IRA, placed it in the CMA account, then wrote a check back to the IRA for $230,000. See Willis Test. I, Page 25, lines 8-13. On April 11, 1997, Ernest Willis had to withdraw another $240,000.00 from the IRA account and transfer it to the CMA account so that he could deposit and cover a $230,000.00 check into the IRA account from the CMA account. See Red Reef's Ex."11" (VL 0606080000586). Immediately prior to April 8, 1997, the CMA account only had a cash balance of $96,726.24. Although the check was

FTL:3024064:1

-13-

written on April 8, 1997, it was not cleared and posted to the retirement account until April 11, 1997. See Red Reef's Ex."11" (VL 0606080000586 and VL 0606080000593). Mr. Silver testified that when an account holder requests a transfer from one account to another, Merrill Lynch usually carries out the transfer on the same day. If there were insufficient funds in the account at the time the request was made, the transfer would be done after the funds became available. See Silver Depo, Page 24, line 17 to Page 25, line 8.

**2.      The $240,000.00 Withdrawal**

**a.      Withdrawal on April 11, 1997 from IRA**

42.     On Friday, April 11, 1997, there was a withdrawal from the Merrill Lynch IRA in the amount of $240,000.00. See Red Reef's Comp. Ex. "12" (VL 0606080000 594); Deposition of Irving Silver, dated October 17, 2008, page 18, line 17 to page, line 2. (the "Silver Depo II"). Mr. Silver testified that according to the Merrill Lynch statements, Mr. Willis made a $240,000 withdrawal from the IRA which was posted on Monday, April 11, 1997. See Red Reef's Comp. Ex. 12 (VL 0606080000594); Silver Depo, Page 18, line 17 to Page 19, line 11. The funds were transferred to the Merrill Lynch CMA joint account. Mr. Silver testified that according to the Merrill Lynch statements, Mr. Willis made a transfer deposit of $240,000 from the IRA to the CMA which posted on April 11, 1997. See Red Reef's Ex. "12" (VL 0606080000584); Silver Depo, Page 19, line 12 to Page 20, line 2.

**b.      Deposit on June 9, 1997 to IRA**

43.     Mr. Silver confirmed that on Monday, June 9, 1997, that $240,000 was transferred into the Merrill Lynch IRA. See Red Reef's Comp. Ex. 13 (VL 0606080000566; Silver Depo, Page 29, line 18 to Page 30, line 8.

**c.      Funds from IRA used to Cover $240,000.00 Deposit**

44.     On Friday, June 6, 1997, Ernest Willis prepared a deposit ticket for the Merrill Lynch IRA for $240,000.00. It was listed as a "Rollover Deposit/Direct Rollover from Qualified Plan." The deposit was made by check and stamped by Merrill Lynch at 1:51PM on June 6, 1997. See Debtor's Exhibit "K". Mr. Silver testified that according to the Merrill Lynch statements, on June 6,

FTL:3024064:1

1997, Mr. Willis signed an IRA distribution form requesting a withdrawal of $180,000. Red Reef's Comp. Ex. 13 (IS 72307-00090); Silver Depo, Page 30, line 15-25.

45.    Mr. Willis admitted that in order to replace the $240,000 IRA withdrawal from April, in June 1997 he withdrew $180,000 from the IRA, placed it in the CMA account, and that he then wrote a check back to the IRA for $240,000. See Willis Test. I, Page 25, lines 14-25.

### 3.    The $180,000.00 Withdrawal

#### a.    <u>Withdrawal on June 6, 1997 from IRA</u>

46.    In order to cover the $240,000.00 transfer from the CMA account to the IRA account, posted on Monday, June 9, 1997, Ernest Willis withdrew $180,000.00 from the IRA account on Friday, June 6, 1997 and transferred it to the CMA account. See Red Reef's Comp. Ex. 13 (VL 060608000557 and VL 0606080000566).

47.    On Friday, June 6, 1997, Willis withdrew $180,000.00, from his IRA. Mr. Willis requested that Merrill Lynch take $180,000.00 out of his IRA and transfer it to his CMA account. See Rule 2004 Willis Exam II, page 57, lines 8 to 12. Willis had checked Part II as the account owner reason for withdrawal "early/premature distribution <u>no known</u> exception." See Willis Exam II, page 66, line 24 to page 67, line 4. Merrill Lynch did <u>not</u> transfer the funds directly to a trustee. Instead, they were transferred to the CMA account. See Willis Exam II, page 67, lines 5 to 11. Mr. Silver testified that according to the Merrill Lynch statements, Mr. Willis made a $180,000 transfer from the IRA to the CMA account on Friday June 6, 1997. See Red Reef's Comp. Ex. "13" (VL 0606080000566 and VL 0606080000557); Silver Depo, Page 31, line 1-24. Mr. Willis admitted that he had requested Merrill Lynch to take $180,000 out of his IRA to place into his CMA account. See Willis Exam II, page 57, lines 8 to 12.

48.    According to Mr. Silver, the transfer request for $180,000, the $180,000 debit to the IRA and the $180,000 credit to the CMA all occurred on the same date, June 6, 1997. See Silver Depo, Page 31, line 25 to Page 32, line 6.

#### b.    <u>Deposit on August 8, 1997 to IRA</u>

49.    Merrill Lynch records reflect that on Friday, August 8, 1997, Merrill Lynch posted a rollover deposit to the IRA from Willis for $180,000.00. Mr. Willis testified that he believed that the

FTL:3024064:1

-15-

term "IRA non-deductible rollover" meant it was a rollover and not deductible out of his income tax. See E. Willis Test. II, Page 51, lines 17-23. Mr. Silver testified that, according to the Merrill Lynch statements, Willis made a $180,000 deposit to the IRA which was posted on Friday, August 8, 1997. See Red Reef's Ex.14 (VL 0606080000530); Silver Depo, Page 32, line 7-23. The funds were re-deposited into the IRA 63 days after the withdrawal.

**c.**      **Funds from IRA used to Cover $180,000.00 Deposit**

50.      On Wednesday, August 6, 1997, Willis prepared a deposit slip to provide $180,000.00 by check to the IRA account. It was listed as "IRA Non-deductible," but not listed as a "Rollover Deposit". While it was dated August 6, 1997, the Merrill Lynch stamp reflects it was stamped at 2:21PM on Friday, August 8, 1997. See Debtor's Exhibit "L". Mr. Willis testified that Debtor's Exhibit L is a deposit slip dated August 6, 1997 for a $180,000 check written by Mr. Willis. Mr. Willis testified that Exhibit L was written in his own handwriting. See E. Willis Test. II, Page 51, lines 2-16. Mr. Silver testified that Mr. Willis wrote a check out of the CMA for $180,000 which did not post until August 11, 1997. See Red Reef's Comp. Ex. 14 (VL0606080000530); Silver Depo, Page 33, line 14 to Page 34, line 5.

51.      Ernest Willis was able to transfer $180,000.00 in a check to his IRA account on Friday, August 8, 1997 by making another larger withdrawal from his IRA account. The check was dated Tuesday, August 5, 1997. It was not credited due to an insufficient cash balance. On Friday, August 8, 1997, Willis authorized (and Merrill Lynch posted) a transfer of $252,000.00 from Willis' IRA account to his CMA account. See Red Reef's Comp. Ex. "14" (VL 0606080000537, VL 0606080000529). The $180,000.00 check was cleared and credited on the same day. Mr. Willis admitted that in order to replace the $180,000 IRA withdrawal from June, on August 8, 1997 he transferred $252,000.00 from his IRA to the CMA, then wrote a check from the CMA back to the IRA for $180,000. See E. Willis Test. I, Page 26, lines 1-6; Page 26, line 20 to Page 27, line 1.

**4.**      **The $252,000.00 Withdrawal**

**a.**      **Withdrawal on August 8, 1997 from IRA**

52.      On Friday, August 8, 1997, Ernest Willis made the withdrawal and transferred

FTL:3024064:1

$252,000.00 to his CMA account. On Friday, August 8, 1997, Ernest Willis requested a distribution of $252,00.00. It was transferred to his CMA account . Merrill Lynch posted the funds on Friday, August 8, 1997. Mr. Silver testified that according to the Merrill Lynch statements, Mr. Willis made a transfer of $252,000 from the IRA to the CMA which posted on August 8, 1997. See Red Reef's Ex."14" (VL 0606080000537); Silver Depo, Page 34, line 22 to Page 35, line 13.

### b.    Deposit on October 8, 1997 to IRA

53.    The $252,000.00 was, in turn, returned or contributed to the IRA account on Wednesday, October 8, 1997. In October, 1997, there was a deposit to Mr. Willis' Merrill Lynch IRA in the amount of $252,000.00 that is noted on the Merrill Lynch records as "1997 Non-Deductive Contribution." The Court read into the record the IRA deposit ticket dated Tuesday, October 7, 1997 in the amount of $252,000 and stamped at 2:56 p.m. See Debtor's Exhibit M; Willis Test. II, Page 40, lines 9-11. Mr. Silver testified that according to the Merrill Lynch records, Mr. Willis deposited $252,000 into the IRA on October 8, 1997. See Red Reef Comp. Ex. 14 (VL 0606080000501 and VL 0606080000508); Silver Depo, Page 35, line 14-18; Page 35, line 25 to Page 36, line 16. Sixty-one (61) days had elapsed between the distribution and the contribution for the identical sum of money. See Willis Exam II, page 97, line 24 to page 98, line 2.

54.    When Mr. Willis was asked if he transferred funds on August 8 and returned them on October 8 he testified that he could not remember. See Willis Exam II, Page 97, lines 19 to 23. Mr. Willis acknowledged that 61 days had elapsed. See Willis Exam II, page 97, lines 24 to 25 and page 98, lines 1 to 2.

### c.    Funds from IRA used to Cover $252,000.00 Deposit

55.    Ernest Willis produced a deposit ticket for the deposit of a $252,000.00 check into the IRA account on Tuesday, October 7, 1997. It was stamped in the PM on October 7, 1997. It was listed as an "IRA Non-Deductible." It was not listed as a Rollover Deposit. See Debtor's Exhibit "M".

56.    Mr. Willis admitted that in order to replace the $252,000 IRA withdrawal from August, in October 1997 he withdrew $270,000 from the IRA, placed it in the CMA, then wrote a check back to the IRA for $252,000. See Willis Test. I, Page 27, lines 2-12. The $252,000.00 check,

FTL:3024064:1

-17-

which Willis executed on the CMA account, for deposit into the IRA account, was written at the time his cash balance was insufficient to cover it. Consequently, he withdrew an additional $270,000.00 from the IRA and transferred it to the CMA account to provide coverage for the check. This occurred on October 8, 1997. The $252,000.00 check cleared and was posted on the same day. See Red Reef's Ex.14 (VL 0606080000501 and VL 0606080000509).

**5.      The $270,000.00 Withdrawal**

**a.      <u>Withdrawn on October 8, 1997 From IRA</u>**

57.    On Wednesday, October 8, 1997, Ernest Willis requested a $270,000.00 distribution from his IRA account which, he withdrew and, in turn, deposited in his CMA account. See Red Reef's Ex. "15" (IS 72307-00098).[5] See Willis Exam II, page 57, line 24 to page 58, line 6. The moneys were transferred out of Mr. Willis' IRA account into his CMA account at Merrill Lynch. Mr. Silver testified that according to the Merrill Lynch statements, on December 9, 1997, Mr. Willis transferred $270,000 from the CMA to the IRA. See Red Reef's Comp. Ex. 15 (VL 0606080000466); Silver Depo, Page 41, lines 5-15.

58.    Mr. Willis testified that he filled out the transfer form in the amount of $270,000.00, on Wednesday, October 8, 1997, See Red Reef's Comp. Ex. 14 (VL 0606080000509), in his own handwriting. See Willis Exam II, page 66, lines 7 to 13. Mr. Willis had checked Part II as the "account owner reason for withdrawal early/premature distribution no known exception." See Willis Exam II, page 66, lines 12 to 15. He testified that Merrill Lynch did not transfer the funds to a trustee but rather to Ernest and Sunday Willis. See Willis Exam II, page 66, lines 16 to 23. Mr. Silver testified that according to the Merrill Lynch statements, Mr. Willis transferred $270,000 from the IRA to the CMA on October 8, 1997. See Red Reef's Ex. "15" (IS 72307-00098); Silver Depo, Page 36, line 21 to Page 37, line 5. Mr. Silver testified that according to the Merrill Lynch statements, on October 8, 1997 there was a $270,000 transfer from the IRA to the CMA. See Red Reef's Comp. Ex. 14 (VL 0606080000509); Silver Depo, Page 37, line 6-19. Mr. Silver testified that according to the Merrill Lynch statements, there was a deposit of $270,000 into the CMA

account. See Red Reef's Ex.14 (VL 0606080000501); Silver Depo, Page 37, line 20 to Page 38, line 6.

### b.    Deposit on December 9, 1997 to IRA

59.    Mr. Willis admitted that in order to replace the $270,000.00 IRA withdrawal from October, in December 1997 he withdrew $282,000 from the IRA, placed it in the CMA, then wrote a check back to the IRA for $270,000.00 See E. Willis Test. I, Page 27, lines 13-20. On Tuesday, December 9, 1997, Merrill Lynch posted a $270,000.00 deposit to his IRA account. See Red Reef's Comp. Ex. "15" (VL 0606080000466); Silver Depo II, page 39, line 12 to line 19; Willis Exam II, page 98, line 3 to Page 99 line 8. The Court read into the record the IRA deposit ticket dated December 8, 1997 in the amount of $270,000 and stamped December 8, 1997 at 1:41 p.m. See Debtor's Exhibit O; Willis Test. II, Page 40, lines 15-17. The money was returned 62 days after it was withdrawn.

### c.    Funds from IRA Used to Cover $270,000.00 Deposit

60.    On Monday, December 8, 1997, Ernest Willis prepared a deposit ticket for a check for $270,000.00 which was deposited into is Merrill Lynch IRA. It is time stamped at 1:41PM on December 8, 1997. See Debtor's Exhibit "O". Mr. Silver testified that Merrill Lynch posted the $282,000 transfer on December 8, 1997, the same date that Mr. Willis requested the transfer. See Silver Depo, Page 43, lines 22-25.

61.    Ernest Willis wrote a check on the CMA account for $270,000.00, which posted on December 9, 1997. See Red Reef's. Ex. 15 (VL 0606080000466); Silver Depo, Page 38, line 7-17; page 39, line 12 to line 18.

62.    When the check was initially written, there was an insufficient cash balance in the CMA account to clear a $270,000.00 check. See Silver Depo II, page 39, line 6 to page 40, line 1. Mr. Silver testified that a "cash balance" means the available funds that an account holder can write a check on. See Red Reef's. Ex. "15" (VL 0606080000466) See Silver Depo, Page 38, line 25 to Page 39, line 11. Mr. Silver confirmed that if the cash balance is insufficient to cover a check, the account holder would have to post a deposit or "go on margin." See Silver Depo, Page 39, line 19 to Page 40, line 1.

FTL:3024064:1

6.      **The $282,000.00 Withdrawal**

a.      **Withdrawal on December 8, 1997**

63.      In order to clear the check, Ernest Willis made another withdrawal of $282,000.00 from the IRA and transferred it to the CMA account. The request for the distribution was made on Monday, December 8, 1997. It was posted by Merrill Lynch to the CMA account on the same date. See Silver Depo, page 40, line 17 to page 42, line 4. The Court read into the record the IRA deposit ticket dated December 8, 1997 in the amount of $270,000 and stamped December 8, 1997 at 1:41 p.m. See Debtor's Exhibit O; E. Willis Test. II, Page 40, lines 15-17.

64.      On Monday, December 8, 1997, Mr. Willis made a distribution request, in his own handwriting, for a transfer of $282,000.00, from the IRA to the CMA account. In December, 1997, Mr. Willis directed Merrill Lynch to transfer $282,000.00 to the CMA account Mr.    Willis  had checked Part II as the "account owner reason for withdrawal early/premature distribution no known exception." See Willis Exam II,  page 65, lines 4 to 7.  He had not checked "normal".  See Willis Exam II, page 65, lines 8 to 10.  The funds were placed into the CMA account . Mr. Silver testified that according to the Merrill Lynch statements, on December 8, 1997, Mr. Willis  filled out an IRA distribution request form for $282,000. (IS 70307-00104), which is the same amount deposited into the CMA to cover the CMA check for $270,000 that posted the following day. See Silver Depo, Page 42, lines 9-25. Mr. Willis identified a distribution request for $282,000, See Red Reef's "16" (IS 72307-00104) dated 12/8/97 which was placed into the CMA account. See Willis Exam II, page 59, lines 2 to 18. Mr. Silver testified that according to the Merrill Lynch statements, on December 8, 1997, Mr. Willis transferred $282,000 from the IRA to the CMA. (IS 70307-00104); See Red Reef's Ex."15" (VL 0606080000465-66; VL 0606080000474); Silver Depo, Page 40, lines 2-16; Page 43, lines 1-20.

b.      **Deposit on February 9, 1998 to IRA**

65.      Mr. Silver testified that according to the Merrill Lynch statements, on February 9, 1998, there was a $282,000 check posted as a debit to the CMA and as a credit to the IRA. See Red Reef's Ex. "16" (VL 0606080000431-432 and VL 0606080000440); Silver Depo, Page 44, line 1-5;

FTL:3024064:1

-20-

Page 44, line14 to Page 45, line 1; Page 49, line 24 to Page 50, line 9. As shown by the Merrill Lynch records, the rollover was not posted to the IRA account until Monday, February 9, 1998. In February, 1998, there was a deposit to Mr. Willis' Merrill Lynch IRA in the amount of $282,000.00 that is noted on the Merrill Lynch records as "Transfer Deposit." The Court read into the record the IRA deposit ticket dated February 6, 1998 in the amount of $282,000 and stamped February 6, 1998 at 2:12 p.m. See Debtor's Exhibit P; E. Willis Test. II, Page 40, lines 18-20.

This was 63 days after the withdrawal date of December 8, 1997.

### c.    Funds from IRA Used to Cover $282,000.00 Deposit

66.    Mr. Willis admitted that in order to replace the $282,000 IRA withdrawal from December, in February 1998 he withdrew $285,000 from the IRA, placed it in the CMA, then wrote a check back to the IRA for $282,000. See Willis Test. I, Page 27, line 22 to Page 28, line 3. On Friday, February 6, 1998, Willis prepared an IRA Deposit Ticket for a check for $282,000.00. It is time stamped by Merrill Lynch for 2:12PM on February 6, 1998. See Debtor's Exhibit "P".

67.    Mr. Silver confirmed that the records depict a $285,000 check from IRA to the CMA, followed by a $282,000 check from the CMA back to the IRA. See Red Reef's Ex.16 (VL 0606080000432). See Silver Depo, Page 48, line 4-15.

68.    Mr. Silver testified that the records depict a $282,000 deposit on February 9, 1998, and a $285,000 distribution from the IRA on the same date. See Plaintiff's Exh. "17" (IS 72307-00106)   See Red Reef's Ex.16 (VL 0606080000431 and VL 0606080000439); Silver Depo, Page 48, line 16 to Page 49, line 2; Page 50, line 10-20. According to the Certification of Ernest Willis [D.E. #  ], he requested a transfer on Friday, February 6, 1998 after the close of daily business by Merrill Lynch. Debtor's Ex. P. Is a true and correct copy of the deposit ticket for $282,000.00. However, the cash balance in the CMA account was not sufficient to write and clear a check for $282,000.00. There was only $111,807.00 in the account. In order to make the check for $282,000.00 good, Ernest Willis withdrew another $285,000.00 from his IRA account and transferred it to the CMA account. See Silver Depo II, page 45, line 6 to page 47, line 13. According to the Merrill Lynch records, they first credited the $285,000.00 transfer (from the IRA to the CMA account) and then posted the $282,000.00 transfer from the CMA account to the IRA

FTL:3024064:1

-21-

account on February 9, 1998.  See Silver Depo II, page 48, line 10 to line 24.

7.      **The $285,000.00 Withdrawal**

a.      <u>**Withdrawn on February 6, 1998 from IRA**</u>

69.     Mr. Willis made a distribution request for $285,000.00, on Friday, February 6, 1998. On Friday, February 6, 1998, Mr. Willis directed Merrill Lynch to transfer $285,000.00 to the CMA account.  Mr. Silver testified that Mr. Willis requested a distribution from his IRA in the amount of $285,000 on February 6, 1998. (IS 72307-00106) See Silver Depo, Page 49, lines 12-21.  On the same date, $285,000 was transferred from the IRA to the CMA.  See Silver Depo, Page 45, lines 6-17.  Merrill Lynch posted the withdrawal on Friday, February 6, 1998.  Silver Depo II, page 50, line 1 to line 20.  Willis then had complete and unfettered control of the funds once they were placed in the CMA account.  See Willis Exam II, page 60, lines 14 to 21.  Willis filled out the transfer form in the amount of $285,000.00, Red Reef's. Ex. 17 (IS 72307-00106), in his own handwriting.  See Willis Exam II, page 64, lines 2 to 9.  Mr. Willis had checked Part II as the "account owner reason for withdrawal early/premature distribution no known exception." See Willis Exam II, page 64, lines 10 to 19.

b.      <u>**Deposit on April 8, 1998 to IRA**</u>

70.     Mr. Silver testified that on April 8, 1998, Mr. Willis: a) took $285,000 out of the CMA, b) deposited $285,000 to the IRA, c) withdrew $283,000 from the IRA, and d) deposited $283,000 to the CMA.  See Silver Depo, Page 51, lines 19-25.  The Court read into the record the IRA deposit ticket dated April 7, 1998 in the amount of $295,000 and stamped February, 1998 at 1:37 p.m.  See Debtor's Exhibit Q; Willis Test. II, Page 40, line 21 to Page 41, line 1.  Mr. Willis testified that the deposit ticket identified as Debtor's Exhibit Q is the deposit ticket he took to the bank on April 7, 1998 and it contains only his own handwriting.   See Willis Test. II, Page 56, line 20 to Page 57, line 7.  Willis admitted that he filled out the April 7, 1998 deposit ticket as a $285,000 transfer from another custodian, but that is not an accurate reflection because he presented the check from the CMA himself.  See Willis Test. II, Page 57, lines 8-23 Page 58, lines 15-16.  Mr. Willis testified that he took the $285,000 deposit to the teller window on April 7, 1998 at 1:37 p.m. and

FTL:3024064:1

-22-

asked the teller to deposit it to his IRA.  See Willis Test. II, Page 57, line 24 to Page 58, line 6.
Willis admitted that in order to replace the $285,000 IRA withdrawal from February, in April 1998
he withdrew $283,000 from the IRA, placed it in the CMA, then wrote a check back to the IRA for
$285,000.  See Willis Test. I, Page 28, lines 4-16.

71.    The rollover monies were not posted to the IRA account until Wednesday, April 8,
1998.  See Red Reef's. Ex.. "18" (VL 0606080000405 and VL 0606080000397).  This was 61 days
after the initial withdrawal.  Mr. Silver testified that on April 8, 1998, a deposit in the amount of
$285,000 posted to the IRA.  See Red Reef's Ex. "18" (VL 0606080000405)  See Silver Depo, Page
51, line 9-14.  Willis admitted that on April 7, 1998 he swapped $283,000 from the Merrill Lynch
IRA by simultaneously withdrawing the funds from the IRA, depositing them to the CMA, then
making a deposit back to the IRA from the CMA.  See Willis Test. II, Page 58, line 17 to Page 61,
line 7.  Willis testified that prior to the time he wrote the check on April 7, 1998 the outstanding cash
balance shown on the March 31, 1997 statement was $126,477.84.  See Red Reef's Ex. 17 (VL
0606080000397)  See Willis Test. II, Page 58, lines 18-21; Page 59, lines 6-10.  Willis admitted that
he knew that Merrill Lynch could not credit him for the $285,000 check from the CMA to the IRA
because there was not enough cash in the CMA without the simultaneous $283,000 transfer from the
IRA to the CMA.  See Willis Test. II, Page 61, line 20 to Page 62, line 6.

c.    **Funds From IRA Used to Cover $285,000 Deposit**

72.    On Tuesday, April 7, 1998, Ernest Willis prepared a deposit ticket for a check for
$285,000.00 in his IRA account.  The deposit ticket is time stamped for 1:37PM on April 7, 1998.
See Debtor's Exhibit "Q".  Debtor's Exhibit Q is a true and correct copy of the deposit ticket for
$285,000.00. The monies were not returned to the IRA account until Wednesday, April 8, 1998.  See
Red Reef's Ex.18 (VL 0606080000397); Deposition of Irving Silver, dated October 17, 2008, page
51, line 9 to line 14.  Exhibit 17.  This was 61 days after the initial distribution.

73.    Mr. Silver testified that on April 8, 1998, a check for $285,000 posted to the CMA
account.  See Red Reef's Ex. "18" (VL 0606080000397).  See Silver Depo, Page 50, line 21 to Page
51, line 2.

74.    In order to clear the check for $285,000.00, which was written on the CMA account,

FTL:3024064:1

for deposit into the IRA account, Ernest Willis made yet another withdrawal from his IRA account. On Wednesday, April 8, 1998, Ernest Willis filled out a transfer form which directed that $283,000.00 be withdrawn from the IRA and transferred to the CMA account. See Red Reef's Ex. 18 (VL 060608 0000405). Mr. Silver testified that on April 8, 1998, Mr. Willis withdrew $283,000 from the IRA and transferred it to the CMA. See Red Reef's Ex. "18" (VL 0606080000398 and VL 0606080000405); Silver Depo, Page 51, lines 15-18; Page 52, lines 3-20.

### N.    In 1998 the Loans from the Merrill Lynch IRA Stopped after the Sale of the Ocean One Property but Other IRA's were Created

75.    On May 1, 1998, Willis and his spouse personally received $1,200,000.00 from the sale of the Ocean One Property. See E. Willis Test. I, Page 30, lines 2-11; Pretrial Order ¶ 29. These funds were deposited to a personal joint account (number xxxxxxxxx4415) in the name of Ernest W. Willis or Sunday Willis, at SunTrust Bank. Willis testified that he deposited the proceeds from the Ocean One Property in his personal account at SunTrust Bank, then wrote a check to the Merrill Lynch IRA for $96,500. See Willis Test. I, Page 30, lines 17-22.

### 1.    New SunTrust Bank IRA is Opened with Ocean One Sale Money

76.    Mr. Willis testified that he opened an IRA account at SunTrust with $90,000 of the Ocean One proceeds. See Willis Test. I, Page 31, lines 2-7. On May 4, 1998 Willis opened an IRA account at SunTrust Bank So. Fla., N.A. It was opened with an initial deposit of $90,000.00. See Debtor's Exhibit "R". It was listed on the IRA Plan Adoption Agreement as a Rollover Contribution. See Debtor's Exhibit "R". The Customer Confirmation reflected that it was a new IRA. The $90,000.00 did not come from another IRA.

77.    The $90,000.00, which was deposited into the SunTrust Bank So. Fla., N.A. IRA account, came directly from a personal joint account of Ernest and Sunday Willis at SunTrust Bank, consisting of moneys received from the sale of the Ocean One Property (cleared on April 30, 1998) by Ernest Willis and Sunday Willis. On the account statement for the period ending May 14, 1998, SunTrust reported that it paid check number 2940 for $90,000.00 on May 5, 1998. This money was placed by Ernest Willis in the SunTrust Bank So. Fla. N.A. IRA account. See Debtor's Exhibit "R". Willis identified a request for a rollover/conversion in the amount of $90,000 from Southern

FTL:3024064:1

Community Bank. See Willis Exam II, page 69, lines 2 to 13. Willis testified that it was a transfer from Merrill Lynch to Southern Community Bank, on June 4, 2002. See Willis Exam II, page 69, lines 14 to 24.

### 2. Ocean One Sales Moneys Deposited with Merrill Lynch in IRA

78.    On or about Friday, June 5, 1998, Merrill Lynch posted a $96,500.00 deposit into the Merrill Lynch IRA account. See Red Reef's Ex. 24 Vol. II, Tab 3 (VL 0606080000370). On Thursday, June 4, 1998, Willis prepared a deposit ticket for a $96,500.00 check, from the personal joint account at SunTrust Bank, for deposit into Merrill Lynch in his IRA account. See Debtor's Exhibit "T".

79.    Willis prepared an IRA deposit ticket, in which he attempted to deposit the $96,500.00 by check. It was time stamped on June 4, 1998 at 3:25PM. He listed it as a "Rollover Deposit". See Debtor's Exhibit "T" which is a true and correct copy of the Deposit Ticket. However, the moneys to actually fund the Merrill Lynch deposit came directly from a joint personal account of Ernest and Sunday Willis at SunTrust Bank.

80.    On Monday, June 8, 1998, SunTrust reported that it paid check number 2962 for $96,500.00 from the personal joint account (No. xxxxxxxxx4415) of Ernest Willis and Sunday Willis, for period ending June 12, 1998.

### 3. AmTrust IRA Opened with Ocean One Sale Proceeds

81.    Ernest Willis positioned more money from the Ocean One North sale in IRA accounts at other financial institutions. Funds from the Ocean One North sale were placed in a new IRA account at AmTrust Bank by Ernest Willis. On Thursday, May 28, 1998, Ernest Willis opened an IRA at AmTrust Bank for $96,500.00. On the IRA account application, (for account number xxxxxx0440) signed by Ernest Willis, he listed the contribution date of the $96,500.00 as May 22, 1998. See Debtor's Exhibit "S".

82.    On May 28, 1998, AmTrust Bank as Trustee for the Ernest W. Willis IRA, placed the $96,500.00 in a 6 month Certificate of Deposit with a maturity date of November 28, 1998. See Debtor's Exhibit "S". The money actually came from a personal account maintained by Ernest and Sunday Willis at SunTrust Bank.

FTL:3024064:1

-25-

83.    On Friday, May 29, 1998, SunTrust reported that it paid check number 2954 for $96,500.00 from the personal joint account (No. xxxxxxxxx4415) of Ernest W. Willis and Sunday Willis. These funds were placed by Ernest Willis in an IRA account at AmTrust Bank. See SunTrust Account Statement (0399545854415) for period ending June 12, 1998. See Debtor's Exhibit "S".

**4.    Withdrawals Stop in 1998**

84.    Willis stopped making substantial withdrawals from his Merrill Lynch IRA account for the remainder of 1998, and made no further distributions in that year from his Merrill Lynch IRA account after the April 30, 1998 sale of the Ocean One Property. See Willis Exam II, page 108, lines 11 to 16.

**O.    The Fidelity Federal IRA Account**

85.    The Debtor transferred funds to an individual retirement account with Fidelity Federal Bank & Trust ("First Fidelity") on August 16, 2002 by causing a direct transfer from the Merrill Lynch IRA of $50,000.00. Mr. Willis identified a Retirement Account Receipt, dated August 16, 2002, for a trustee transfer of a $50,000 CD. See Red Reef's Ex. 19 (IS 72307-00139); Willis Exam II, page 73, lines 6 to 18. On November 8, 2002, the Debtor transferred an additional $10,000.00 from the Merrill Lynch IRA to the Fidelity Federal IRA. See Plaintiff's Exhibit "20" (IS 72307-00148). Willis identified a $50,000 IRA transfer request that was from his Merrill Lynch IRA account to Fidelity Federal Bank. See Red Reef's Ex. 19 (IS 72307-00137); Willis Exam II, page 71, lines 18 to 25 and page 72, lines 1 to 2. He testified that all the money used to fund the Fidelity Federal IRA was funded by his account at Merrill Lynch. See Willis Exam II, page 72, lines 3 to 6.

**P.    The Amtrust IRA Account**

86.    The Debtor established another individual retirement account with AmTrust Bank on June 21, 2005. The Debtor withdrew $108,433.60 from the AmTrust Bank IRA on October 27, 2006. See Red Reef's Ex. 23 (ATB 9100700028). On December 27, 2006, the Debtor deposited $108,433.00 into his AmTrust IRA. AmTrust Bank records denote this contribution as simply "Rollover." See Red Reef's Ex. 23 (ATB 9100700003 - 9100700004).

**Q.    No Tax Returns Filed Reflecting IRA Income**

FTL:3024064:1

87.    The Debtor has not filed federal income tax returns for the tax years 1994 through 2007. See Pretrial Order, ¶ 15.  The Debtor has not reported any of his IRA transactions from 1997 or 1998 to the Internal Revenue Service.  See E. Willis Test. I, Page 31, line 8-11.  Extensions had been filed with the federal government but Mr. Willis could give no reason for not filing tax returns for all those years.  See Willis Exam II, page 13, lines 15 to 21.  All of his tax return filing extensions have expired.  Mr. Willis testified that since 1994, he has not relied on anyone other than himself to determine any tax liabilities and has determined the amount of taxes he owed by figuring his gross income, deductible expenses and tax deductions from his salary.  See E. Willis Test. II, Page 24, lines 2-16.

**R.    Post-Petition Transfers**

88.    Additionally, it is undisputed that the Debtor has withdrawn money from the Merrill Lynch and Fidelity (n/k/a National City) IRA accounts post-petition.  See Pretrial Order, ¶ 55.  Mr. Willis testified that he has received money from his three IRA accounts since the filing of his bankruptcy petition in 2007.  See Willis Test. I, Page 40, lines 10-17.  Willis testified that he had a mandatory requirement to take out $60,000 in 2007 and the same amount again in 2008.  He estimates that since the petition date he has withdrawn approximately $110,000.  See E. Willis Test. I, Page 40, lines 18-25.

**MEMORANDUM OF LAW**

**APPLICATION OF 11 U.S.C.§522, 26 U.S.C. § 4975 AND 26 U.S.C.§408 TO DEBTORS CLAIMED IRA EXEMPTION**

11 U.S.C. § 522(b)(3)(C) provides in pertinent part as follows:

> (b)(1)    Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection...

***

> (3)    Property listed in this paragraph is-

***

FTL:3024064:1

(C)     retirement funds to the extent that those funds <u>are in a</u> <u>fund or account that is exempt from taxation under section 401, 403, 408,</u> <u>408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986.</u>

In the instant case, the funds in the Debtor's IRA Accounts are <u>not</u> in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986. The Debtor had the ability to access the funds, including principal, in the IRA Accounts, and, did access and borrow from those funds in direct violation of applicable law governing the tax-exempt status of the IRA Accounts.

The funds in the IRA Accounts are not exempt from taxation and do not qualify for exemption and/or exclusion from the bankruptcy estate as a result of several voluntary actions taken by the Debtor with respect to the IRA Accounts, including, but not limited to: the Debtor's engagement in numerous prohibited transactions in violation of 26 U.S.C. §4975; the Debtor's engagement in multiple rollovers; as a separate ground, the Debtor's failure to complete rollover transactions within sixty (60) days; and, the Debtor impermissibly transferred non-exempt funds into IRAs.

## A.    THE DEBTOR ENGAGED IN NUMEROUS PROHIBITED TRANSACTION UNDER 26 U.S.C.§4975

As a result of numerous prohibited transactions by the Debtor in violation of 26 U.S.C. § 4975, the Debtor's IRA Accounts are not qualified for a tax exemption under Internal Revenue Code Section 408. Therefore, the assets of the Debtor's IRA Accounts are property of the estate which are not exempt pursuant to 11 U.S.C. § 522(b)(3)(C).

26 U.S.C.A. § 4975 (c) defines a "prohibited transaction" as any <u>direct</u> or <u>indirect</u>;

(A)     <u>sale</u> or exchange, or leasing of any property between a plan and a disqualified person;

(B)     <u>lending</u> of <u>money</u> or <u>other</u> <u>extension</u> of <u>credit</u> between a plan and a disqualified person;

(C)     furnishing of goods, services, or facilities between a plan and a disqualified person;

(D)     <u>transfer to,</u> or <u>use by</u> or <u>for</u> the benefit of a disqualified person of the income or assets of a plan;

(E)     act by a disqualified person who is a fiduciary whereby he <u>deals</u> <u>with</u> <u>the</u> <u>income</u> <u>or</u> <u>assets</u> <u>of</u> <u>a plan</u> <u>in</u> <u>his</u> <u>own</u> <u>interest</u> or for his own account; or

(F)     <u>receipt</u> <u>of</u> <u>any</u> <u>consideration</u> <u>for</u> <u>his</u> <u>own</u> <u>personal</u> <u>account</u> by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

Under 26 U.S.C. §4975, a participant or beneficiary of a IRA or pension or profit share is prohibited from using fund assets for personal purchases, benefit or loans. See; In re Hughes, 293 B.R. 528 (Bankr. M.D. Fla. 2003); Wood v. Commissioner of International Revenue, 955 F.2d 908 (4th Cir. 1992); Hockaden and Associates, Inc., v. Commissioner of Internal Revenue, 800 F.2d 70 (6th Cir. 1986); Harris v. Commissioner of Internal Revenue, T.C. Memo. 194-22, 1994 WL 12316, *1 (U.S. Tax Ct. January 19, 1994); Clarke v. Commissioner of Internal Revenue, T.C. Memo. 1994-390, 1994 WL 442109 (U.S. Tax Ct. 1994).

In the case of In re Hughes, 293 B.R 528 (Bankr. M. D. Fla. 2003) the trustee challenged the debtor's claim of exemption in his IRA account on the basis that the Debtor engaged in a prohibited transaction , as described in 26 U.S.C. § 4975(c)(1)(B), which caused the IRA account to lose its status pursuant to 26 U.S.C. 408(e)(2)(A).  Prior to filing for bankruptcy, the debtor borrowed $27,000.00 from his IRA account and gave it to corporation in which he was the principal and likely sole stockholder and officer. The corporation also repaid the amount, which was then placed back into the IRA account prior to the bankruptcy filing.  The Court held that the debtor's loan to his corporation was a misuse of funds from his IRA account, affecting the status of funds in account, and prevented debtor from claiming exemption, notwithstanding that debtor promptly repaid the loan in same year that it was made.  The Hughes court reasoned that

whether or not an account qualifies as a tax exempt IRA account is dealt with in 26 U.S.C. § 408, specifically sub clause (e)(2)(A). This sub clause provides if during the taxable year, the individual holder of the account engages in any transaction which is prohibited by 26 U.S.C. § 4975, *such account ceases to be an individual retirement account as of the first day of such taxable year* (emphasis supplied).

Id. at 530.  The Hughes court entered and order sustaining the Trustee's objection to the

Debtor's claim of exemption and determined that the funds in the Debtor's IRA were subject to administration by the trustee. Id. 530.

**B.    THE 1993 MORTGAGE ACQUISITION TRANSACTION WAS PROHIBITED UNDER 26 U.S.C. § 4975**

Funds from an IRA account cannot be borrowed for the use and benefit of a disqualified person, even when they are used to acquire a home, without losing its tax exempt status pursuant to Section 408 of the Internal Revenue Code. By example, in the case of Harris v. Commissioner of Internal Revenue, T.C. Memo. 194-22, 1994 WL 12316, *1 (U.S. Tax Ct. January 19, 1994), the tax payers invested $23,611 as a downpayment on a home intended for their retirement years, by utilizing funds from their IRA. The Harris court held that

> The use of funds by an IRA account for the acquisition of property solely for the purpose of providing petitioners with a personal residence is a "prohibited transaction" under section 4975 and particularly subsection (c)(1)(D) thereof, which lists, as such a transaction, "any direct or indirect * * * transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan". Section 4975(e) defines "plan" to include "an individual retirement account" described in section 408. Since the owner of an IRA account is considered a "disqualified person", see H.Conf.Rept. 93-1280 (1974), 1974-3 C.B. 415, 501, the conditions of section 4975 have been met. Section 408(e)(2) provides that an IRA account loses its exemption where it engages in a transaction prohibited by section 4975 and that, under such circumstances, the assets of the account are deemed to have been distributed.

Id. at *1. The Court noted that it was immaterial whether the IRA account or petitioners personally made the investment since, under either procedure, a distribution to petitioners from the IRA account occurred. In Clarke v. Commissioner of Internal Revenue, T.C. Memo. 1994-390, 1994 WL 442109 (U.S. Tax Ct. 1994), the taxpayers, each withdrew $16,361 (for a total of $32,722) from their respective IRAs to acquire a home. The Clarke court found that the use of the funds to acquire a home, even for the good-faith purchase of a home, (in the mistaken belief that the acquisition would not cause the loss of exempt status) was a prohibited transaction under 26 U.S.C. §4975. The court held that "Petitioners' withdrawal of their IRA funds would, without further action, result in a taxable event. Sec. 408(d)(1); sec. 1.408-4(a), Income Tax Regs." Id. at 1.

In Hockaden and Associates, Inc., v. Commissioner of Internal Revenue, 800 F. 2d 70 (6th

FTL:3024064:1

-30-

Cir. 1986), the Sixth Circuit Court of Appeals upheld a tax court decision which found that the taxpayer, a disqualified person, was subject to excise tax pursuant to 26 U.S.C. § 4975 for engaging in an extension of credit. Id. at 72. Specifically, the taxpayer took five (5) separate loans (totaling $93,700.00) from an employee profit-sharing plan during a four year period which he failed to repay. The Sixth Circuit Court of Appeals noted that:

> both the Internal Revenue Code and ERISA, in almost identical language, prohibit the lending of money or extension of credit between a plan and a disqualified person. The term 'disqualified person' includes a 'fiduciary' and an "employer any of whose employees are covered by the plan.

Id. at 71.

Assignment of a Note or Mortgage is also a prohibited transaction destroying the tax exempt status. For example, in the case of Wood v. Commissioner of Internal Revenue, 955 F.2d 908 (4th Cir. 1992), the issue before the Fourth Circuit Court of Appeals was whether the assignment by the whether the tax payer's assignment of third-party promissory notes to an ERISA Defined Benefit Plan to meet the plan's funding obligations was a prohibited transaction within the meaning of 26 U.S.C. § 4975(c). Specifically, the taxpayer in the Wood case, contributed three promissory notes with face values totaling $114,000. One note in the face amount of $60,000 made payable to the taxpayer was received by him in when he sold his principal residence. The remaining two notes, in the face amounts of $39,000 and $15,000, were executed by purchasers in real estate transactions in which the taxpayer acted as a broker. The notes were transferred to the plan "without recourse" and were paid in full within a couple years of their assignment to the plan. The Wood court held that "since the concededly disqualified person, the taxpayer, transferred non-cash property to the plan to satisfy his statutory funding obligation, he engaged in a 'sale or exchange' under § 4975." Id. at 914.

The Wood court reasoned that Congress enacted a prohibited transactions rule to prevent persons with a close relationship to a plan from using that relationship to the detriment of plan beneficiaries and recognized that:

> the prohibited transaction provisions of § 4975 are part of a remedial scheme designed to protect the retirement security of plan participants and beneficiaries by

prohibiting certain types of transactions which are particularly subject to abuse.

Id. at 914. As a result,

> the prohibition against sales or exchanges of property between a plan and a disqualified person is intended to avoid the potential for over valuations of property to the detriment of the plan, precisely as occurred in this case when Wood purported to discharge a $114,000 obligation with third-party promissory notes having a value of only $94,430.

Id. at 912.

In the instant case, the Debtor destroyed the tax exempt status of his Merrill Lynch IRA pursuant to 26 U.S.C. 408(e) when he and/or Ocean One took loans from the Merrill Lynch IRA and he and/or Ocean One used the funds. These acts were prohibited transactions within the meaning of 26 U.S.C. 4975. Specifically, in December of 1993, the Debtor acquired the Peoples Southwest mortgage, which was a liability of his corporation, Ocean One North, Inc. In fact, in his Certification dated February 25, 2008, the Debtor conceded that, "on December 20, 2003, I sent an authorization letter to Merrill Lynch to transfer $700,000.00 in funds from my Merrill Lynch IRA to a Sun Bank account (Payment Number 0399545854415) titled jointly with Mrs. Willis," and "$700,000.00 was then transferred from the Sun Bank account to the Escrow Account maintained by Greenberg Traurig to complete my acquisition of the People's Mortgage, discussed above."

On Monday, December 13, 1993, there was a Loan Closing pursuant to the Settlement Agreement where the Debtor personally received an assignment of the mortgage from People's Southwest. See Rule 2004 Examination of Ernest W. Willis, dated December 11, 2007, page 33, lines 18-25; page 34, line 1. The loan of the IRA funds to the Debtor and/or Ocean One North, Inc., both disqualified persons, is a prohibited transaction within the meaning of 26 U.S.C. §4975.

As a result, Debtor's IRA Accounts are not in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986 and the Red Reef's and the Trustee's objection to the Debtor's claim of exemption in the Merrill Lynch IRA should be sustained. In re Hughes, 293 B.R. 528 (Bankr. M.D. Fla. 2003)

FTL:3024064:1

### C.     PROPERLY OPERATED IRA IS LIMITED TO ONE ROLLOVER PER TWELVE-MONTH PERIOD

Under 26 U.S.C. §408(d)(3)(B), an IRA loses its exempt status to the extent that a debtor engages in more than one rollover in any given twelve-month period.  See Holding v. Cook, 521 F.Supp.2d 832 (C.D. Ill.2007), Bhattacharyya v. Commissioner of Internal Revenue, T.C. Memo 2007-19, 2007 WL 247821 (U.S. Tax Ct. 2007); Alpern v. Commissioner of Internal Revenue, T.C. Memo 2000-246, 2000 WL 1101038 (U.S. Tax Ct. 2000).  The Internal Revenue Code allows only one tax-free rollover in a twelve-month period. 26 U.S.C. §408(d)(3)(B).   See Martin v. Commissioner of Internal Revenue, T.C. Memo 1992-331, 1192 WL 122468 (U.S. Tax Ct.1992).

Even if a person has more than one IRA, he can only make a single rollover for any of them in a 12-month period.  By example, in the case of In Alpern v. Commissioner of Internal Revenue, T.C. Memo 2000-246, 2000 WL 1101038 (U.S. Tax Ct. 2000), the United States Tax Court found that 26 U.S.C. §408 was violated by the owner of an IRA where he made multiple rollovers in a single year.  The Alpern court reasoned that:

> for this purpose, all IRA's are treated as one contract, all distributions during any taxable year are treated as one distribution, and the value of the contract, the income on the contract, and the investment in the contract are computed as of the close of the calendar year in which the taxable year in which the taxable year begins.

Id. at 5.  See also Bhattacharyya, T.C. Memo. 2007-19, 2007 WL 247821 (U.S. Tax Ct. 2007)(Court condemned multiple rollovers finding that the distributions from taxpayer's two IRA accounts, totaling $749,930.00, were taxable and should be included in the petitioner's gross income.); Holding v. Cook, 2007 WL 2948398 (C.D.Ill. 2007)(Where a taxpayer made six distributions from his IRA account between April and July 2005, the Court found that only the firs rollover of $100,000 was tax exempt and the remaining transfers totaling $480,496.00 violated 26 U.S.C. § 408(d)(3)(b)).

In Martin v. Commissioner of Internal Revenue, T.C. Memo 1992-332, 1992 WL 122468 (U.S. Tax Ct. 1992), ("Marten I") the court recognized that the rollover exception can only be invoked once per year stating that:

> Section 408(d)(3)(B) provides that the section 408(d)(3)(A)(i) rollover exemption can only be used once during any 1-year period.  Thus, all subsequent distributions

received during the year are taxable under section 408(d)(1).

Id. at 3. The facts in the Martin case illustrate the multiple rollover prohibition. The debtor made the following transactions by taking distributions from his E.F. Hutton IRA account, by checks payable to him, and, in turn, depositing them in an IRA account at Merrill Lynch: (a) $111,615.57 on February 5, 1987; $164,596.13 on May 8, 1987; and $ 10,000.00 on September 3, 1987. The Martin court found that:

> the February 5, 1987 check that petitioner received from E.F. Hutton was payable to him rather than Merrill Lynch. ... Petitioner obtained dominion and control over funds at the time he received the check payable to him. He exercised that dominion by placing the funds into a new IRA with Merrill Lynch, but had the ability to dispose of, spend, or pledge as collateral the $111,615.57 in any manner he pleased. Consequently, it is our view that petitioner's February 5, 1987, transfer does not fall within the ambit of Rev. Rul. 78-406, supra because (1) the transfer was not made between two trustees, and (2) the $111,615.57 was distributed directly to petitioner.

Id. at 3. The Martin court specifically recognized that the issuance of a check from one IRA to the individual taxpayer, which was, in turn, placed in a new IRA was subject to the single rollover rule holding that:

> since the February 5, 1987, distribution was nontaxable IRA rollover, the two subsequent 1987 distributions, on May 8 ($164,596.13) and September 3 ($10,000.00), are taxable because the section 408(d)(3)(A) exemption was not available for these withdrawals.

Id. at 3; see also Martin v. Commissioner of Internal Revenue, T.C. Memo 1994-213, 1994 WL 179760 (U.S. Tax Ct. 1994).

In the instant case, the Debtor stipulated that he made multiple rollovers from his IRA in 1997 and 1998. Pretrial Order ¶ 56; see also Red Reef's and Trustee's Trial Exhibits "39," "24," "25". He testified that he withdrew over $1.4 million in prohibited multiple "rollovers" from his IRA in 1997 alone so that he could make use of the money.[6] See Rule 2004 Examination of Ernest

---

[6] In the Traditional Individual Retirement Account Disclosure and Custodial Agreement, Merrill Lynch clearly cautions its clients that, "You may make only one tax-free rollover from an IRA from which or to which you made a prior rollover within any one-year period measured from the date of the first distribution." See P. Exh. 1, Traditional Individual Retirement Account (IRA) Disclosure and Custodial Agreement, page 4.

Notwithstanding, 26 U.S.C. §408(d)(3)(B) and the Merrill Lynch Agreement, the Debtor testified, under oath,
FTL:3024064:1

W. Willis dated December 11, 2007, page 101, lines 13-20. To the extent that the Merrill Lynch IRA had not already ceased to be exempt in 1993, the contributions to the Merrill Lynch IRA on Monday, June 9, 1997; Friday, August 8, 1997; Wednesday, October 8, 1997; Tuesday, December 9, 1997; Monday, February 9, 1998; Wednesday, April 8, 1998; and, Friday, June 5, 1998 violated the prohibition against multiple rollovers and the rollover limitations described in 26 U.S. C. § 408(d) and, constituted excess contributions to the Merrill Lynch IRA. As a result, the IRA lost its exempt status. See Direct Testimony of Expert Witness Sharon Dixon, Esq., ¶48; see also Exhibit "39".

Even if the Debtor had made each of the above mentioned deposits into his IRA within 60 days of the related withdrawal, the deposits of funds to his IRA during the period of August 1997 to April 1998 were not "timely" because they were not permitted to be made at all. According to the Debtor's own Certification he was not permitted to make another deferred withdrawal and rollover until at least April 10, 1998.[7] Consequently, all of the deposits after April 11, 1997 violated the "once per year" rollover limit. They were not permitted to be made and resulted in excess contributions to the IRA. They constituted impermissible loans for the benefit of the Debtor. The claim by the Debtor, that some of the rollovers were timely within 60 days, does not legitimize the numerous loan transfers which are prohibited under 26 U.S.C. § 4975, as multiple rollovers.

26 U.S.C. §4975 clearly prohibits an IRA account owner's "use" of IRA assets or the "lending of money" from the IRA to the IRA owner. The Debtor's repeated check-swapping and check-kiting of the withdrawals and deposits of IRA funds demonstrate his misuse of the IRA funds and impermissible borrowing from the IRA, regardless of whether the withdrawals were specifically denominated as such in any withdrawal paperwork. The result of engaging in such activity is loss of

---

that on Friday, June 6, 1997, Wednesday, October 8, 1997, and Monday, December 8, 1997, funds were transferred from the Merrill Lynch IRA to a non-exempt, non-IRA account maintained by Ernest and Sunday Willis. See Willis Exam II, page 54, lines 23 to 16; page 57, lines 3 to 5; page 57, lines 19 to 25; page 58, lines 1 to 2; page 59, lines 7 to 14. Mr. Willis had complete and unfettered control of the funds when they were transferred to the non-exempt account. See, Willis Exam II, page 57, lines 19 to 23; page 58, lines 10 to 13; page 59, line 19 to 22; page 60, lines 14 to 17. These funds were later returned to the IRA, from non-exempt accounts, within a one-year period, in violation of the multiple rollover prohibitions. See Willis Exam II, page67, line 21 to page 68, line 3; page 57, lines 8 to 12; page 96, lines 4 to 11; page 57, line 24 to page 58, line 6; page 59, lines 2 to 18; page 64, line 24 to page 65, line 3.

[7] The 12-month period begins with the date of withdrawal. For example, the expiration of one year from June 6, 1997 transfer is no later than June 5, 1998.

FTL:3024064:1

the IRA's qualified status, under 26 U.S.C. §408(e)(2) and 26 U.S.C. §4975. The Debtor's Merrill Lynch IRA does not qualify for exemption pursuant to 11 U.S.C. § 522(b)(3)(C) and Red Reef's and the Trustee's objection to the Debtor's claimed exemptions should be sustained.

### D.    IRA ROLLOVER MUST BE RETURNED IN 60 DAYS

Another separate and independent ground for loss of exempt status is the failure of the Debtor to complete any rollover transaction within sixty (60) days. It is well-settled that IRA funds lose their exempt status when the rollover contribution occurs more than sixty (60) days after the distribution, in violation of 26 U.S.C. §408(d)(1) and (d)(3) and Sec. 1.408-4(b)(1) and (2) Income Tax Regs. See Mostafa v. Commissioner of Internal Revenue, T.C. Memo. 2006-106, 2006 WL 1319461 (U.S. Tax Ct. 2006); Sternberg v. Internal Revenue Service, 119 Fed. Appx. 338, 2005 WL 78775 (2d Cir. 2005); Dirks v. Commissioner of Internal Revenue, T.C. Memo 2004-138, 2004 WL 1277976 (U.S. Tax Ct. 2004); Metcalf v. Commissioner of Revenue, 62 Fed. Appx. 811, 811-812 (9th Cir. 2003) (a taxpayer's claim for overpayment was properly denied by the United States Tax Court "because Metcalf's 1996 IRA distribution was taxable as income when Metcalf failed to rollover the distribution into another IRA account within 60 days of receipt.); Welander v. Commissioner of Internal Revenue, 92 T.C. No. 51, 92 T.C. 866 (United States Tax Ct. 1989).

In Welander v. Commissioner of Internal Revenue, 92 T.C. No. 51, 92 T.C. 866 (United States Tax Court 1989), the court encountered the argument that since the 60-day rollover period did not expire for a transaction in 1985, that the transaction would not be taxable until 1986. The United States Tax Court rejected this argument. It stated that:

> unfortunately, petitioner's argument, does not follow the clear language of the statute. The general rule is that the IRA distributions are taxable in the year received. Section 408(d)(1). An exception to this rule is effective when the distribution is rolled over into another IRA within 60 days. This exception only applies if the distribution is actually PAID into another account. Section 408(d)(3)(A). If not, then the exception never applies and the general rules prevails."

Id. at 866.

In the instant case, the Debtor repeatedly engaged in transfers from his IRA to his non-exempt account and then failed to obtain the return of the funds to the IRA in sixty (60) days. In

FTL:3024064:1

computing the withdrawals from the IRA, the Trustee and the Creditor utilized the date on which the withdrawal was actually posted as a debit to the IRA account and a credit to the Debtor's personal account. To be consistent, as to deposits into the IRA account, the Trustee and Creditor utilized the date on which the deposit was actually posted as a credit to the IRA account and the date that the check or withdrawal was debited to the Debtor's personal account.

### E.    AN IRA IS NOT EXEMPT WHEN IT IS FUNDED BY A ROLLOVER FROM ANOTHER NON-EXEMPT IRA

When the proceeds of an IRA account include funds which are rolled over from a non-exempt IRA or pension plan, the IRA is also not exempt . See 26 U.S.C. §4975 and 26 U.S.C. §401; see also In re Hughes, 293 B.R. 528 (Bankr. M. D. Fla. 2003); In re Swift, 124 B. R. 475, 485 (Bkrtcy. Ct. W.D. Tex. 1991); Martin v. Commissioner of Internal Revenue, T.C. Memo 1994-213, 1994 WL 179760 (U.S. Tax Ct. 1994); Beardsley v. Admiral Insurance Company, 647 So.2d 327, 329 (Fla. 3rd DCA 1994)("the commingling of a non-exempt deposit with an exempt account will automatically cause the entire account to lose its exempt status.")

It is well-settled that 26 U.S.C. §408(d)(3) (iii) "prohibits qualification to an IRA rolled over from a non-qualified plan." In re Swift, 124 B. R. 475, 485 (Bankr. W.D. Tex. 1991) (where funds in the Debtor's IRA were rolled over from a non-qualified procedure Keogh plan, the IRA account was not exempt in bankruptcy.) In the case of In re Banderas, 236 B.R. 837 (Bankr. M. D. Fla. 1998), the profit sharing plan which was used to fund the debtor's IRA was formed by a corporation, where the Debtor was the sole shareholder, at a time when the corporation had no employees and the debtor had already retired. The court held that the assets of the Debtor's IRA and profit sharing plan were property of the estate and not exempt because the funds in the IRA and the assets in the profit sharing plan were not qualified for a tax exemption under Internal Revenue Code Section 401, and in turn, by Florida Statute § 222.21(2)(a). The Court reasoned that Section 401(a) of the Internal Revenue Code requires that a profit sharing plan be formed for the exclusive benefit of a corporation's employees and the Debtor's profit sharing plan could not satisfy this requirement because the corporation did not have any employees and the Debtor has already retired at the time of the formation of the plan. As a result the funds in the debtor's IRA account were funds rolled over from

FTL:3024064:1

the debtor's unqualified profit sharing plan, the funds in the IRA were not exempt.

The Court in Martin v. Commissioner of Internal Revenue, T.C. Memo 1994-213, 1994 WL 179760 (U.S. Tax Ct. 1994) found that a taxpayer's Merrill Lynch IRA account became disqualified, due to a violation of the multiple rollover rule and as a result, the transfer of funds into the taxpayer's IRA's at other financial institutions were similarly disqualified. Specifically, the taxpayer received a check payable to him for the entire balance of $111,615.57 of his Hutton IRA which he deposited into a Merrill Lynch IRA account on the same day. Approximately 90 days later, the taxpayer withdrew 164,596.13 on May 8, 1987. On July 7, 1987, the taxpayer deposited $120,000 into his Merrill Lynch IRA account. Thereafter, on September 3, 1987, the taxpayer again withdrew funds from the Merrill Lynch IRA in the amount of $10,000. On December 7, 1987, the taxpayer to the entire balance in the Merrill Lynch IRA and transferred it to a Charles Schwab IRA. On November 25, 1988, the balance of the Charles Schwab IRA in turn, was transferred to another IRA with Fidelity Investments. On December 31, 1988, the balance in the Fidelity IRA was $58,443. It had increased to $72,213.25 by December 31, 1989. In June 1990, the funds were withdrawn from the Fidelity IRA. On September 21, 1990, petitioner deposited $60,000 to the Charles Schwab IRA. As of December 31, 1990, there was $61,498.62 in the Charles Schwab

Since the Merrill Lynch IRA had been disqualified for multiple rollovers, the Martin Court took the view that all of the transfers were not tax-exempt and were to be treated as income, (except for the $2,000.00 annual contribution). It held that with reductions to the year end IRA balances for allowable section 219 contributions, as provided by section 4973(b)(2)(C), the excess contribution amounts for 1989 and 1990 were $68,213.25 and  $55,498.62, respectively. Id. at 3.

The instant case is similar to the Martin case as it is undisputed that the Debtor funded his Fidelity Federal IRA from funds which were obtained from his Merrill Lynch IRA. See Rule 2004 Examination of Ernest W. Willis, dated December 11, 2007, page 72, lines 22 to 25 and Page 73, line 1.[8] Since this transaction occurred *after* the Merrill Lynch IRA had lost its exempt status, the

---

[8] The Debtor identified a $50,000.00 IRA transfer request. See Red Reef's Comp. Exh. 19 (IS 72307-00137). These monies were transferred from his Merrill Lynch IRA account 751-74781 to an IRA at Fidelity Federal Bank. See Willis Exam II, page 71, lines 18 at page 72, line 2.

FTL:3024064:1

Fidelity Federal IRA were no longer exempt as a matter of law.

In 2002, the Debtor funded $50,000.00 of his Fidelity Federal IRA with funds from his improperly operated and disqualified IRA account at Merrill Lynch. See Red Reef and Trustee's Composite Exhibit 21 to the deposition, Bates stamped IS 72307-00137, from his Merrill Lynch IRA account 751-74781 to Fidelity Federal Bank; See also Willis Exam II, page 71, lines 18 to 25 and page 72, lines 1 to 2. The Debtor testified that all the money used to fund the Fidelity Federal IRA was funded by his account at Merrill Lynch. See Willis Exam II, page 72, lines 3 to 6. The Debtor further testified that he believes he now has $140,000.00 in his Fidelity Federal account. Willis Exam II, December 11, 2007, page 72, lines 7 to 9.

Moreover, the Debtor also testified that his AmTrust Bank IRA (Certificate of Deposit) came from his Merrill Lynch IRA account. See Willis Exam II, page 45, lines 14 to 23. Furthermore, it was shown to have been funded by contributions in excess of $2,000/year or impermissibly multiple rollovers.

The transfer of funds from the Merrill Lynch IRA to the Fidelity Federal Bank and AmTrust Bank occurred after the Merrill Lynch IRA lost its exempt status or as a result of multiple rollovers. Since these accounts were no longer exempt as, a matter of law, this Court should sustain Red Reef's objection to the Debtor's claimed exemption in the Fidelity Federal IRA and Amtrust IRA pursuant to 11 U.S.C. 522 and find that the IRA Accounts are non-exempt property of the estate subject to administration by the Trustee.

**F.**     **EFFECT THE FAILURE TO FILE INCOME TAX RETURNS REFLECTING RECEIPT OF IRA INCOME**

Mr. Willis has not filed federal income tax returns for the tax years 1994 through 2007. See Pretrial Order ¶ 15 All of his tax return filing extensions have expired. In his Rule 2004 Examination, Mr. Willis could give no reason for not filing tax returns for all of those years. See Willis Exam II, page 13, lines 15 to 21.

It is undisputed that Ernest Willis has not declared whether any income tax is owed on any of the 1993 through 2006 IRA transactions. This is because Ernest Willis has not filed any income tax returns for at least the past 12 years. Mr. Willis does not possess any tax returns reporting, declaring

FTL:3024064:1

or reflecting payment of IRA income. See Willis Exam II, page 9, lines 12 to 18; page 13, line 22 to page 14 line 1.

### G.    UNDER 26 U.S.C. §4975 THE ENTIRE IRA IS NOT QUALIFIED

Under 26 U.S.C. §4975, a violation renders the entire IRA as non-qualifying. The federal courts have recognized that when the IRA account is utilized, in violation of 26 U.S.C. §4975, the entire exemption is forfeited. For example, in In re Hughes, 293 B.R. 528 (Bankr. M. D. Fla. 2003), the United States Bankruptcy Court for the Middle District of Florida found that:

> whether or not an account qualifies as a tax exempt IRA account is dealt with in 26 U.S.C. §408, specifically sub clause (e)(2)(A). This sub clause provides if during the taxable year, the individual holder of the account engages in any transaction which is prohibited by 26 U.S.C. § 4975, such account ceases to be an individual retirement account as of the first day of such taxable year (emphasis supplied).

Id. at 530. The Hughes court held that there was no genuine issues of material fact and that the Trustee is entitled as a matter of law to an Order sustaining his objection to the claim of exemption. All of the funds were treated as non-exempt. The Trustee was entitled to an Order "determining that the funds in the Schwab IRA Account No. 4560-0258 are subject to administration by the Trustee." Id. at 530.

In the instant case, the Debtor's entire IRA Accounts should similarly be found to be non-exempt property of the estate subject administration by the Trustee as a result of the Debtor's disqualifying actions.

### H.    ENTITLEMENT TO ENTRY OF INJUNCTION AND ACCOUNTING

Pursuant to her adversary proceeding, the Trustee seeks the entry of a permanent injunction, enjoining the Debtor and his agents, including his banks and financial institutions from directly or indirectly transferring, receiving, pledging, assigning, liquidating, spending, encumbering or otherwise disposing of any funds and assets in the IRA Accounts. 11 U.S.C. § 105 provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The power granted to the Court pursuant to 11 U.S.C. § 105(a) includes the power to enter injunctions that are necessary to carry out the provisions of the Bankruptcy Code. Altman v. Davis Dingle Family Dentistry (In re EZ Pay Services, Inc.), 389 B.R. 751 (Bankr. M.D. Fla. 2007). When injunctive relief is sought pursuant to 11 U.S.C. § 105, the moving party must

FTL:3024064:1

generally satisfy the traditional nonbankruptcy requirements for such relief as follows: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party and (4) if issued, the injunction would not be adverse to the public interest. See Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F. 3d 1205, 1210 (11th Cir. 2003); see also Dzikowski v. Tri-O-Clean Systems, Inc. (In re Tri-O-Clean, Inc.), 230 B.R. 192 (Bankr. S.D. Fla. 1998).

In the instant case, the Trustee is entitled to injunctive relief. As more fully set forth above, the Debtor is not entitled to claim an exemption in his IRA Accounts pursuant to 11 U.S.C. § 522(b)(3)(C) because the Debtor's IRA Accounts are not in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986 as a result of several prohibit transactions under 26 U.S.C. 4975. As a result the assets in such IRA Accounts are property of the estate and subject to administration by the Trustee.

The estate will suffer irreparable harm if the Debtor and his agents, including his banks and financial institutions from directly or indirectly transferring, receiving, pledging, assigning, liquidating, spending, encumbering or otherwise disposing of any funds and assets in the IRA Accounts which are property of the estate pursuant to 11 U.S.C. § 541. Without the preliminary injunction becoming permanent and remaining in place, the Debtor would have unfettered access to the IRA accounts and be able to dissipate the assets therein.

The threatened injury to the bankruptcy estate outweighs whatever damage the proposed injunction may cause the Debtor. In fact, given that the assets in the IRA accounts are non-exempt property of the estate as set forth in the preceding analysis, the Debtor would not suffer harm as he is not entitle to dissipate assets of the estate and should have no access to the funds.

The public interest will not be adversely affected. In fact, the public interest will be benefited by the relief requested by the Trustee, by preventing the continued dissipation of assets by the Debtor which if maintained, will be available to be administered for the benefit of creditors upon entry of an order sustaining the Trustee's and Red Reef's objections to the Debtor's claimed exemption in the IRA Accounts. Lastly, the Trustee does not have any other adequate remedy at law to prevent the Debtor from dissipating the IRA Accounts absent a continuing injunction.

Based on the foregoing, the Trustee respectfully request that the Court enter judgment in favor of the Trustee and against the Debtor enjoining the Debtor and his agents, including his banks and financial institutions from directly or indirectly transferring, receiving, pledging, assigning, liquidating, spending, encumbering or otherwise disposing of any funds and assets in the IRA Accounts which are property of the estate pursuant to 11 U.S.C. § 541

The Trustee further seeks entry of an Order against Debtor requiring him to provide a detailed, sworn accounting setting forth and listing:

    (a)    the funds or assets which Willis transferred, received, pledged, assigned, liquidated, spent, encumbered, withdrawn or otherwise disposed of from the IRA accounts Post-Petition; and,

    (b)    a listing for the disposition of funds or assets from the IRA Accounts post-petition, including but not limited to, a list of all property purchased and/or services paid for from any and all Post-Petition withdrawals or transfers of funds from the IRA Accounts.

## CONCLUSION

Red Reef and the Trustee respectfully request that this Court should enter an order, in favor of Red Reef and the Trustee finding that the IRA account at Merrill Lynch are not exempt pursuant to 11 U.S.C § 522(b)(3)(C); enter an order in favor of Red Reef finding that the Fidelity Federal Bank and Trust and AmTrust Bank are not exempt pursuant to 11 U.S.C § 522(b)(3)(C); enter a judgment in favor of the Trustee issuing a permanent injunction and requiring the Debtor to provide an accounting as to all funds removed from the IRA Accounts post-petition and enter such other relief as it deems just and proper

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am qualified to practice in this Court as set forth in Local Rule 2090-1(A).

                            Respectfully Submitted,

                            **THE RAKUSIN LAW FIRM,**
                            **A PROFESSIONAL ASSOCIATION**
                            2919 E. Commercial Blvd.
                            Fort Lauderdale, Florida 33308
                            Tel: 954.356.0496
                            Fax: 954.356.0416
                            Stephen Rakusin, Esq.
                            Fla. Bar No. 183408

And

**EHRENSTEIN CHARBONNEAU CALDERIN**
Mellon Financial Center
1111 Brickell Avenue, Suite 2915
Miami, FL 33131
(305) 722-2002 Telephone
(305) 722-2001 Facsimile

By:___/s/_____
ROBERT CHARBONNEAU
Florida Bar No.: 968234

And

**RUDEN, MCCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.**


s/ Heather L. Ries
MICHAEL R. BAKST, ESQ.
Florida Bar No.: 866377
HEATHER L. RIES, ESQ.
Florida Bar No.: 581933
Attorneys for Trustee
222 Lakeview Avenue, Suite 800
West Palm Beach, Florida 33401
Telephone:  (561) 838-4565
Facsimile:   (561) 514-3465

FTL;3024064:1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                          Case No.: 07-11010-BKC-PGH
                                                Chapter 7 proceeding
ERNEST W. WILLIS

        Debtor.
_____/

ORDER SUSTAINING RED REEFS'S OBJECTION TO AMENDED
EXEMPTIONS (D.E. # 378) AND TRUSTEE'S OBJECTION TO
DEBTOR'S AMENDED EXEMPTIONS (D.E. # 279) AND
JUDGMENT IN FAVOR OF TRUSTEE ON VERIFIED COMPLAINT
FOR INJUNCTIVE RELIEF AND FOR ACCOUNTING

THIS MATTER came before the Court in West Palm Beach, Florida, on the 3rd day of

December 2008 for an evidentiary hearing on Red Reef, Inc.'s ("Red Reef") Objections to Amended

Exemptions (D.E. # 378)("Red Reef's Objection") and the Trustee, Deborah C. Menotte's (the

FTL:3023963:1

1

"Trustee") Objection to Debtor's Amended Exemptions (D.E. # 279) ("Trustee's Objection")[1] and

for trial on the Trustee's Verified Complaint for Injunctive Relief and For Accounting (Adv. Case

No. 08-01383-PGH-A).  After considering Red Reef's Objection and the Trustee's Objection, the

testimony of witnesses and exhibits entered into evidence at the hearing, the arguments of counsel,

and for the reasons discussed below, Red Reef's Objection and the Trustee's Objection are **sustained**

and judgment is entered in favor of the Trustee and against the Debtor enjoining the Debtor the

Debtor and his agents, including his banks and financial institutions from directly or indirectly

transferring, receiving, pledging, assigning, liquidating, spending, encumbering or otherwise

disposing of any funds and assets in the IRA Accounts and requiring the Debtor to provide a detailed

accounting to the Trustee of all funds removed for the IRA Accounts post-petition.

    The Court having considered Red Reef's Objection and the Trustee's Objection, the

applicable law, and being otherwise fully advised in the premises hereby

**ORDERS AND ADJUDGES** that:

    1.    Red Reef's Objection with respect to the Debtor's claimed exemption in the Debtor's

Merrill Lynch IRA, Amtrust IRA and Fidelity Federal IRA are SUSTAINED.  The Debtor is not

entitled to claim his Merrill Lynch IRA, Amtrust IRA and Fidelity Federal IRA as exempt pursuant

to 11 U.S.C. § 522(b)(3)(C).  The assets in the Merrill Lynch IRA, Amtrust IRA and Fidelity Federal

IRA are property of estate subject to administration by the Trustee.

    2.    The Trustee's Objection with respect to the Debtor's claimed exemption in the

Debtor's Merrill Lynch IRA is SUSTAINED.  The Debtor is not entitled to claim his Merrill Lynch

---

1 The Trustee withdrew her objection to the Amtrust IRA and Fidelity Federal IRA, maintaining an objection only as
FTL:3023963:1

IRA as exempt pursuant to 11 U.S.C. § 522(b)(3)(C). The assets in the Merrill Lynch IRA are property of estate subject to administration by the Trustee.

      3.     The Debtor and his agents, including his banks and financial institutions are enjoined from directly or indirectly transferring, receiving, pledging, assigning, liquidating, spending, encumbering or otherwise disposing of any funds and assets in the IRA Accounts which are property of the estate pursuant to 11 U.S.C. § 541.

      4.     The Debtor shall provided the Trustee with a detailed, sworn accounting of all funds removed form the Merrill Lynch IRA, Amtrust IRA and Fidelity Federal IRA.

      5.     Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate final judgment shall be entered by the Court contemporaneously herewith.

###

Submitted by:
Heather L. Ries, Esq.
222 Lakeview Ave., Suite 1330
West Palm Beach FL 33401
Phone: (561) 238-9900
Facsimile: (561) 238-9920

**Heather L. Ries, Esq. is directed to serve copies of this order on the parties listed and file a certificate of service.**

- J.M. Kelley Investigative Services, Inc., POB 608082, Orlando, FL 32860

- Stephen B Rakusin, 1 E Broward Blvd #444, Ft. Lauderdale, FL 33301

- SunTrust Bank, Bankruptcy Support, POB 85092, Richmond, VA 23286

**Notice will be mailed electronically to:**

- Michael R Bakst    mrb@ebcblaw.com, chris@ebclaw.com;diane@ebclaw.com

---

to the Merrill Lynch IRA (D.E. # 406).
FTL:3023963:1

3

- Jacqueline Calderin    jc@ECCcounsel.com,
  mj@ecccounsel.com;scunningham@ECCcounsel.com;phornia@ecccounsel.com

- Rilyn A Carnahan    rac@ebcblaw.com

- Robert P. Charbonneau    rpc@ECCcounsel.com,
  scunningham@ECCcounsel.com;mj@ecccounsel.com;phornia@ecccounsel.com

- Robert F. Elgidely    relgidely@gjb-law.com, cbucolo@gjb-law.com

- Kevin C Gleason    kgpaecmf@aol.com

- Kenneth M Jones    kjones@moodyjones.com

- Soneet R. Kapila    msams@kapilaco.com

- Gary J. Lublin    garylublin@aol.com

- Deborah Menotte    menottetrustee@bellsouth.net, FL43@ecfcbis.com

- Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov

- Natalie S Pappas    nataliepappas@gmail.com

- Heather L Ries    hlr@ebcblaw.com, mab@ebcblaw.com

- Harry J Ross    hross@hjrlaw.com, jerri@hjrlaw.com

- John A. Watson    john.watson@marshallwatson.com

- Scott R. Weiss    scott.weiss@marshallwatson.com